# UNITED STATES *v.* ARVIZU

No. 00–1519.   Argued November 27, 2001—Decided January 15, 2002

REHNQUIST, C. J., delivered the opinion for a unanimous Court. SCALIA, J., filed a concurring opinion, *post*, p. 278.

*Austin C. Schlick* argued the cause for the United States. With him on the briefs were *Solicitor General Olson, Assistant Attorney General Chertoff, Deputy Solicitor General Dreeben,* and *Deborah Watson.*

*Victoria A. Brambl* argued the cause for respondent. With her on the brief was *Fredric F. Kay.**

*Briefs of *amici curiae* urging affirmance were filed for the DKT Liberty Project by *Julia M. Carpenter;* and for the National Association of Criminal Defense Lawyers et al. by *Lawrence S. Lustberg* and *Risa E. Kaufman.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Respondent Ralph Arvizu was stopped by a border patrol agent while driving on an unpaved road in a remote area of southeastern Arizona. A search of his vehicle turned up more than 100 pounds of marijuana. The District Court for the District of Arizona denied respondent's motion to suppress, but the Court of Appeals for the Ninth Circuit reversed. In the course of its opinion, it categorized certain factors relied upon by the District Court as simply out of bounds in deciding whether there was "reasonable suspicion" for the stop. We hold that the Court of Appeals' methodology was contrary to our prior decisions and that it reached the wrong result in this case.

On an afternoon in January 1998, Agent Clinton Stoddard was working at a border patrol checkpoint along U. S. Highway 191 approximately 30 miles north of Douglas, Arizona. App. 22, 24. See Appendix, *infra* (containing a map of the area noting the location of the checkpoint and other points important to this case). Douglas has a population of about 13,000 and is situated on the United States-Mexico border in the southeastern part of the State. Only two highways lead north from Douglas. See App. 157. Highway 191 leads north to Interstate 10, which passes through Tucson and Phoenix. State Highway 80 heads northeast through less populated areas toward New Mexico, skirting south and east of the portion of the Coronado National Forest that lies approximately 20 miles northeast of Douglas.[1]

The checkpoint is located at the intersection of 191 and Rucker Canyon Road, an unpaved east-west road that connects 191 and the Coronado National Forest. When the checkpoint is operational, border patrol agents stop the traf-

---

[1] Coronado National Forest consists of 12 widely scattered sections of land covering 1,780,000 acres in southeastern Arizona and southwestern New Mexico. The section of the forest near Douglas includes the Chiricahua, Dragoon, and Peloncillo Mountain Ranges.

fic on 191 as part of a coordinated effort to stem the flow of illegal immigration and smuggling across the international border. See *id.*, at 20–21. Agents use roving patrols to apprehend smugglers trying to circumvent the checkpoint by taking the backroads, including those roads through the sparsely populated area between Douglas and the national forest. *Id.*, at 21–22, 26, 80. Magnetic sensors, or "intrusion devices," facilitate agents' efforts in patrolling these areas. See *id.*, at 25. Directionally sensitive, the sensors signal the passage of traffic that would be consistent with smuggling activities. *Ibid.*; Tr. of Oral Arg. 23–24.

Sensors are located along the only other northbound road from Douglas besides Highways 191 and 80: Leslie Canyon Road. Leslie Canyon Road runs roughly parallel to 191, about halfway between 191 and the border of the Coronado National Forest, and ends when it intersects Rucker Canyon Road. It is unpaved beyond the 10-mile stretch leading out of Douglas and is very rarely traveled except for use by local ranchers and forest service personnel. App. 26. Smugglers commonly try to avoid the 191 checkpoint by heading west on Rucker Canyon Road from Leslie Canyon Road and thence to Kuykendall Cutoff Road, a primitive dirt road that leads north approximately 12 miles east of 191. *Id.*, at 29–30. From there, they can gain access to Tucson and Phoenix. *Id.*, at 30.

Around 2:15 p.m., Stoddard received a report via Douglas radio that a Leslie Canyon Road sensor had been triggered. *Id.*, at 24. This was significant to Stoddard for two reasons. First, it suggested to him that a vehicle might be trying to circumvent the checkpoint. *Id.*, at 27. Second, the timing coincided with the point when agents begin heading back to the checkpoint for a shift change, which leaves the area unpatrolled. *Id.*, at 26, 47. Stoddard knew that alien smugglers did extensive scouting and seemed to be most active when agents were en route back to the checkpoint. Another border patrol agent told Stoddard that the same

sensor had gone off several weeks before and that he had apprehended a minivan using the same route and witnessed the occupants throwing bundles of marijuana out the door. *Id.*, at 27.

Stoddard drove eastbound on Rucker Canyon Road to investigate. As he did so, he received another radio report of sensor activity. *Id.*, at 29. It indicated that the vehicle that had triggered the first sensor was heading westbound on Rucker Canyon Road. He continued east, passing Kuykendall Cutoff Road. He saw the dust trail of an approaching vehicle about a half mile away. *Id.*, at 31. Stoddard had not seen any other vehicles and, based on the timing, believed that this was the one that had tripped the sensors. *Id.*, at 31–32. He pulled off to the side of the road at a slight slant so he could get a good look at the oncoming vehicle as it passed by. *Id.*, at 32.

It was a minivan, a type of automobile that Stoddard knew smugglers used. *Id.*, at 33. As it approached, it slowed dramatically, from about 50–55 to 25–30 miles per hour. *Id.*, at 32, 57. He saw five occupants inside. An adult man was driving, an adult woman sat in the front passenger seat, and three children were in the back. *Id.*, at 33–34. The driver appeared stiff and his posture very rigid. He did not look at Stoddard and seemed to be trying to pretend that Stoddard was not there. *Id.*, at 33. Stoddard thought this suspicious because in his experience on patrol most persons look over and see what is going on, and in that area most drivers give border patrol agents a friendly wave. *Id.*, at 59. Stoddard noticed that the knees of the two children sitting in the very back seat were unusually high, as if their feet were propped up on some cargo on the floor. *Id.*, at 34.

At that point, Stoddard decided to get a closer look, so he began to follow the vehicle as it continued westbound on Rucker Canyon Road toward Kuykendall Cutoff Road. *Id.*, at 34–35. Shortly thereafter, all of the children, though

still facing forward, put their hands up at the same time and began to wave at Stoddard in an abnormal pattern. *Id.*, at 35, 61. It looked to Stoddard as if the children were being instructed. Their odd waving continued on and off for about four to five minutes. *Id.*, at 35, 73.

Several hundred feet before the Kuykendall Cutoff Road intersection, the driver signaled that he would turn. *Id.*, at 36. At one point, the driver turned the signal off, but just as he approached the intersection he put it back on and abruptly turned north onto Kuykendall. The turn was significant to Stoddard because it was made at the last place that would have allowed the minivan to avoid the checkpoint. *Id.*, at 37. Also, Kuykendall, though passable by a sedan or van, is rougher than either Rucker Canyon or Leslie Canyon Roads, and the normal traffic is four-wheel-drive vehicles. *Id.*, at 36, 63–64. Stoddard did not recognize the minivan as part of the local traffic agents encounter on patrol, *id.*, at 37, and he did not think it likely that the minivan was going to or coming from a picnic outing. He was not aware of any picnic grounds on Turkey Creek, which could be reached by following Kuykendall Cutoff all the way up. *Id.*, at 54. He knew of picnic grounds and a Boy Scout camp east of the intersection of Rucker Canyon and Leslie Canyon Roads, *id.*, at 31, 53, 54, but the minivan had turned west at that intersection. And he had never seen anyone picnicking or sightseeing near where the first sensor went off. *Id.*, at 53, 75.

Stoddard radioed for a registration check and learned that the minivan was registered to an address in Douglas that was four blocks north of the border in an area notorious for alien and narcotics smuggling. *Id.*, at 37–38, 66–67. After receiving the information, Stoddard decided to make a vehicle stop. *Id.*, at 38. He approached the driver and learned that his name was Ralph Arvizu. Stoddard asked if respondent would mind if he looked inside and searched

the vehicle. *Id.*, at 43. Respondent agreed, and Stoddard discovered marijuana in a black duffel bag under the feet of the two children in the back seat. *Id.*, at 45–46. Another bag containing marijuana was behind the rear seat. *Id.*, at 46. In all, the van contained 128.85 pounds of marijuana, worth an estimated $99,080. Brief for United States 8.

Respondent was charged with possession with intent to distribute marijuana in violation of 21 U. S. C. § 841(a)(1) (1994 ed.). He moved to suppress the marijuana, arguing among other things that Stoddard did not have reasonable suspicion to stop the vehicle as required by the Fourth Amendment. After holding a hearing where Stoddard and respondent testified, the District Court for the District of Arizona ruled otherwise. App. to Pet. for Cert. 21a. It pointed to a number of the facts described above and noted particularly that any recreational areas north of Rucker Canyon would have been accessible from Douglas via 191 and another paved road, making it unnecessary to take a 40-to-50-mile trip on dirt roads. *Id.*, at 22a.

The Court of Appeals for the Ninth Circuit reversed. 232 F. 3d 1241 (2000). In its view, fact-specific weighing of circumstances or other multifactor tests introduced "a troubling degree of uncertainty and unpredictability" into the Fourth Amendment analysis. *Id.*, at 1248 (internal quotation marks omitted). It therefore "attempt[ed] . . . to describe and clearly delimit the extent to which certain factors may be considered by law enforcement officers in making stops such as the stop involv[ing]" respondent. *Ibid.* After characterizing the District Court's analysis as relying on a list of 10 factors, the Court of Appeals proceeded to examine each in turn. It held that seven of the factors, including respondent's slowing down, his failure to acknowledge Stoddard, the raised position of the children's knees, and their odd waving carried little or no weight in the reasonable-suspicion calculus. The remaining factors—the

road's use by smugglers, the temporal proximity between respondent's trip and the agents' shift change, and the use of minivans by smugglers—were not enough to render the stop permissible. *Id.*, at 1251. We granted certiorari to review the decision of the Court of Appeals because of its importance to the enforcement of federal drug and immigration laws. 532 U. S. 1065 (2001).

The Fourth Amendment prohibits "unreasonable searches and seizures" by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest. *Terry* v. *Ohio*, 392 U. S. 1, 9 (1968); *United States* v. *Cortez*, 449 U. S. 411, 417 (1981). Because the "balance between the public interest and the individual's right to personal security," *United States* v. *Brignoni-Ponce*, 422 U. S. 873, 878 (1975), tilts in favor of a standard less than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity " 'may be afoot,' " *United States* v. *Sokolow*, 490 U. S. 1, 7 (1989) (quoting *Terry, supra,* at 30). See also *Cortez*, 449 U. S., at 417 ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity").

When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. See, *e. g., id.,* at 417–418. This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person." *Id.*, at 418. See also *Ornelas* v. *United States*, 517 U. S. 690, 699 (1996) (reviewing court must give "due weight" to factual inferences drawn by resi-

dent judges and local law enforcement officers). Although an officer's reliance on a mere "'hunch'" is insufficient to justify a stop, *Terry, supra,* at 27, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard, *Sokolow, supra,* at 7.

Our cases have recognized that the concept of reasonable suspicion is somewhat abstract. *Ornelas, supra,* at 696 (principle of reasonable suspicion is not a "'finely-tuned standar[d]'"); *Cortez, supra,* at 417 (the cause "sufficient to authorize police to stop a person" is an "elusive concept"). But we have deliberately avoided reducing it to "'a neat set of legal rules,'" *Ornelas, supra,* at 695–696 (quoting *Illinois* v. *Gates,* 462 U. S. 213, 232 (1983)). In *Sokolow,* for example, we rejected a holding by the Court of Appeals that distinguished between evidence of ongoing criminal behavior and probabilistic evidence because it "create[d] unnecessary difficulty in dealing with one of the relatively simple concepts embodied in the Fourth Amendment." 490 U. S., at 7–8.

We think that the approach taken by the Court of Appeals here departs sharply from the teachings of these cases. The court's evaluation and rejection of seven of the listed factors in isolation from each other does not take into account the "totality of the circumstances," as our cases have understood that phrase. The court appeared to believe that each observation by Stoddard that was by itself readily susceptible to an innocent explanation was entitled to "no weight." See 232 F. 3d, at 1249–1251. *Terry,* however, precludes this sort of divide-and-conquer analysis. The officer in *Terry* observed the petitioner and his companions repeatedly walk back and forth, look into a store window, and confer with one another. Although each of the series of acts was "perhaps innocent in itself," we held that, taken together, they "warranted further investigation." 392 U. S., at 22. See also *Sokolow, supra,* at 9 (holding that factors which by them-

selves were "quite consistent with innocent travel" collectively amounted to reasonable suspicion).

The Court of Appeals' view that it was necessary to "clearly delimit" an officer's consideration of certain factors to reduce "troubling . . . uncertainty," 232 F. 3d, at 1248, also runs counter to our cases and underestimates the usefulness of the reasonable-suspicion standard in guiding officers in the field. In *Ornelas* v. *United States,* we held that the standard for appellate review of reasonable-suspicion determinations should be *de novo,* rather than for "abuse of discretion." 517 U. S., at 691. There, we reasoned that *de novo* review would prevent the affirmance of opposite decisions on identical facts from different judicial districts in the same circuit, which would have been possible under the latter standard, and would allow appellate courts to clarify the legal principles. *Id.,* at 697. Other benefits of the approach, we said, were its tendency to unify precedent and greater capacity to provide law enforcement officers with the tools to reach correct determinations beforehand: Even if in many instances the factual "mosaic" analyzed for a reasonable-suspicion determination would preclude one case from squarely controlling another, "two decisions when viewed together may usefully add to the body of law on the subject." *Id.,* at 697–698.

But the Court of Appeals' approach would go considerably beyond the reasoning of *Ornelas* and seriously undercut the "totality of the circumstances" principle which governs the existence *vel non* of "reasonable suspicion." Take, for example, the court's positions that respondent's deceleration could not be considered because "slowing down after spotting a law enforcement vehicle is an entirely normal response that is in no way indicative of criminal activity" and that his failure to acknowledge Stoddard's presence provided no support because there were "no 'special circumstances' rendering 'innocent avoidance . . . improbable.'" 232 F. 3d, at 1248–1249. We think it quite reasonable that a driver's

slowing down, stiffening of posture, and failure to acknowledge a sighted law enforcement officer might well be unremarkable in one instance (such as a busy San Francisco highway) while quite unusual in another (such as a remote portion of rural southeastern Arizona). Stoddard was entitled to make an assessment of the situation in light of his specialized training and familiarity with the customs of the area's inhabitants. See *Ornelas, supra,* at 699. To the extent that a totality of the circumstances approach may render appellate review less circumscribed by precedent than otherwise, it is the nature of the totality rule.

In another instance, the Court of Appeals chose to dismiss entirely the children's waving on grounds that odd conduct by children was all too common to be probative in a particular case. See 232 F. 3d, at 1249 ("If every odd act engaged in by one's children . . . could contribute to a finding of reasonable suspicion, the vast majority of American parents might be stopped regularly within a block of their homes"). Yet this case did not involve simply any odd act by children. At the suppression hearing, Stoddard testified about the children's waving several times, and the record suggests that he physically demonstrated it as well.[2] The District Court Judge, who saw and heard Stoddard, then characterized the waving as "methodical," "mechanical," "abnormal," and "certainly . . . a fact that is odd and would lead a reasonable officer to wonder why they are doing this." App. to Pet. for Cert. 25a. Though the issue of this case does not turn on the children's idiosyncratic actions, the Court of Appeals should not have casually rejected this factor in light of the District Court's superior access to the evidence and the well-recognized inability of reviewing courts to reconstruct what happened in the courtroom.

---

[2] At one point during the hearing, Stoddard testified that "[the children's waving] wasn't in a normal pattern. It looked like they were instructed to do so. They kind of stuck their hands up and began waving to me like this." App. 35.

Having considered the totality of the circumstances and given due weight to the factual inferences drawn by the law enforcement officer and District Court Judge, we hold that Stoddard had reasonable suspicion to believe that respondent was engaged in illegal activity. It was reasonable for Stoddard to infer from his observations, his registration check, and his experience as a border patrol agent that respondent had set out from Douglas along a little-traveled route used by smugglers to avoid the 191 checkpoint. Stoddard's knowledge further supported a commonsense inference that respondent intended to pass through the area at a time when officers would be leaving their backroads patrols to change shifts. The likelihood that respondent and his family were on a picnic outing was diminished by the fact that the minivan had turned away from the known recreational areas accessible to the east on Rucker Canyon Road. Corroborating this inference was the fact that recreational areas farther to the north would have been easier to reach by taking 191, as opposed to the 40-to-50-mile trip on unpaved and primitive roads. The children's elevated knees suggested the existence of concealed cargo in the passenger compartment. Finally, for the reasons we have given, Stoddard's assessment of respondent's reactions upon seeing him and the children's mechanical-like waving, which continued for a full four to five minutes, were entitled to some weight.

Respondent argues that we must rule in his favor because the facts suggested a family in a minivan on a holiday outing. A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct. See *Illinois* v. *Wardlow*, 528 U. S. 119, 125 (2000) (that flight from police is not necessarily indicative of ongoing criminal activity does not establish Fourth Amendment violation). Undoubtedly, each of these factors alone is susceptible of innocent explanation, and some factors are more probative than others. Taken together, we believe they sufficed to form a particularized and objective basis for Stoddard's

stopping the vehicle, making the stop reasonable within the meaning of the Fourth Amendment.

The judgment of the Court of Appeals is therefore reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

[Appendix to opinion of the Court follows this page.]

JUSTICE SCALIA, concurring.

I join the opinion of the Court, because I believe it accords with our opinion in *Ornelas* v. *United States,* 517 U. S. 690, 699 (1996), requiring *de novo* review which nonetheless gives "due weight to inferences drawn from [the] facts by resident judges . . . ." As I said in my dissent in *Ornelas,* however, I do not see how deferring to the District Court's factual inferences (as opposed to its findings of fact) is compatible with *de novo* review. *Id.,* at 705.

The Court today says that "due weight" should have been given to the District Court's determinations that the children's waving was " 'methodical,' 'mechanical,' 'abnormal,' and 'certainly . . . a fact that is odd and would lead a reasonable officer to wonder why they are doing this.' " *Ante,* at 276. "Methodical," "mechanical," and perhaps even "abnormal" and "odd," are findings of fact that deserve respect. But the inference that this "would lead a reasonable officer to wonder why they are doing this," amounts to the conclusion that their action was suspicious, which I would have thought (if *de novo* review is the standard) is the prerogative of the Court of Appeals. So we have here a peculiar sort of *de novo* review.

I may add that, even holding the Ninth Circuit to no more than the traditional methodology of *de novo* review, its judgment here would have to be reversed.

# APPENDIX TO OPINION OF THE COURT

Adapted from U.S. Geological Survey Topographic Map of Douglas, Arizona; New Mexico (1959, Revised 1970) Scale 1:250,000.