**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 2, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

       Plaintiff - Appellee,

v.

NINA LYNN CHEROMIAH,

       Defendant - Appellant.

No. 05-2168

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CR-04-1315)**

---

Michael W. Lilley (Jess R. Lilley on the brief), Lilley Law Offices, Las Cruces, New Mexico for the Defendant - Appellant.

Laura Fashing, Assistant United States Attorney (David C. Iglesias, United States Attorney, with her on the brief), Albuquerque, New Mexico, for the Plaintiff - Appellee.

---

Before **LUCERO**, **EBEL**, and **MURPHY**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

Nina Cheromiah pled guilty to conspiring to possess with the intent to distribute 50 kilograms or more of marijuana. Cheromiah was a passenger in a van stopped by a Border Patrol agent near the Mexico-New Mexico border on a road known to be used by

smugglers to avoid immigration checkpoints. While the Border Patrol agent determined that the van's passengers were United States citizens, he also detected the odor of dryer sheets, a product sometimes used to mask the odors of drugs. After a consensual search, the agent discovered nearly 120 pounds of marijuana. In pleading guilty, Cheromiah reserved her right to appeal the district court's denial of her motion to suppress the evidence obtained as a result of the stop and continued detention of the van. Because we conclude that under the totality of the circumstances the Border Patrol agent had reasonable suspicion both to stop the van and to detain its occupants pending the search of the vehicle, we **AFFIRM**.

## I

On the evening of April 7, 2004, United States Border Patrol Agent Christopher Dooley was on roving patrol on Interstate 25 near Hatch, New Mexico, in an unmarked Border Patrol vehicle. He parked his vehicle on New Mexico Highway 26 near an on-ramp to I-25 because, in his experience, alien and narcotics smugglers frequently take Highway 26 through Hatch to evade Border Patrol checkpoints located on nearby I-10 and I-25. Dooley was approximately 80 to 85 miles from the Mexican border.

At about dusk, an old gray van displaying a temporary Texas license plate approached Dooley's vehicle. As the van approached, the van's driver and a passenger noticed Dooley, who was sitting behind the wheel in full uniform. They immediately stiffened up and looked straight ahead. As the van continued past Dooley, he saw two other people in the back of the van moving around: one was sitting up, and the other,

according to Dooley's testimony, was "diving down."

Dooley trailed the van onto I-25, activated his emergency lights, and pulled the van over. He suspected the van might be smuggling illegal aliens for several reasons: vans are often used for smuggling aliens because of their large size; the van had temporary Texas license plates suggesting it may have been recently purchased; and the van's presence on Highway 26 suggested that if the van had come from Texas, the driver took a well-known circuitous route frequently used by smugglers to avoid the Border Patrol checkpoints in southern New Mexico.[1]

Dooley approached the van and asked the driver and passenger to indicate their citizenship. The driver and passenger, later identified as Marisela Barrera and Sherell Cox, replied they were United States citizens. Dooley repeated the question to the two persons in the back of the van. Both women, Nina Cheromiah and a juvenile non-defendant, also stated they were United States citizens. Dooley proceeded to question the occupants. Barrera stated that she was coming from Deming, where they had just dropped someone off, and that she had recently purchased the van in El Paso, Texas. When asked whether all of her companions had initially traveled together to El Paso, she replied that they had taken a bus the day before from Denver, Colorado. This explanation

---

[1] Smugglers traveling north from El Paso frequently detour west on I-10 to Deming, then take Highway 26 northeast to Hatch, and then rejoin I-25 northbound. This route avoids all three fixed checkpoints operated by the Border Patrol in southern New Mexico. One is on northbound I-25, 26 miles north of Las Cruces, Mexico; another is on New Mexico Highway 185, which runs parallel to I-25; and the third is on I-10 between Las Cruces and Deming, New Mexico.

aroused Dooley's suspicions because he could not understand why so many people would take a bus from Denver to El Paso only to purchase a van and then drop someone off in Deming one day later.

At the hearing on the motion to suppress, Dooley testified that he smelled the odor of dryer sheets emanating from the rear of the van while he was talking with Barrera. In his report, written just after the arrest, however, he wrote that he smelled dryer sheets only after he moved to the opposite side of the van and opened the sliding door to speak to the other occupants.[2] Because in Dooley's experience drug smugglers often use dryer sheets to mask the smell of narcotics, he asked Barrera for permission to have his canine inspect the van. Barrerra consented to the inspection, and Dooley asked all of the occupants of the van to step outside. Dooley escorted his canine to the van, and the canine immediately alerted to a bag located in the rear of the van. On opening the bag, Dooley found a number of small bundles wrapped in cellophane and dryer sheets. He field tested a small quantity of the contents of one bundle and discovered that they contained marijuana. Dooley placed all occupants of the van under arrest. Fifteen minutes later, additional Border Patrol agents arrived to assist in transporting the occupants and the van to a nearby checkpoint. A search of the van revealed 107 bundles of marijuana, weighing just under 120 pounds.

A federal grand jury returned a two-count indictment against Cheromiah and two-

_____

[2] The district court found that Dooley did not smell the dryer sheets until after he opened the side door. Our review of the record reveals this finding was not clearly erroneous.

co-defendants, Barrera and Cox. Count 1 charged Cheromiah and her co-defendants with conspiring to possess with the intent to distribute 50 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 846. Count 2 charged them with possessing with the intent to distribute 50 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C).

Cheromiah moved to suppress evidence obtained as a result of Dooley's stop of the van. After holding an evidentiary hearing, the district court denied the motion. Following an unsuccessful motion to reconsider the denial of her suppression motion, Cheromiah entered a conditional plea of guilty to the indictment, preserving her right to appeal the district court's denial of her motion to suppress. The district court sentenced Cheromiah to three years probation with the condition that she serve the first six months of her probation under home detention. Cheromiah appeals in accordance with her conditional guilty plea.

## II

On appeal, Cheromiah argues that Dooley violated her Fourth Amendment rights by pulling the van over without having reasonable suspicion to believe that the van contained illegal aliens. She also argues that even if the initial stop was justified, reasonable suspicion that the van contained illegal aliens was dispelled when Dooley determined all the occupants were United States citizens. Given this suspicion, she argues, continued detention of the van was unreasonable and violated her Fourth Amendment rights.

Standards governing our review of a district court's ruling on a motion to suppress are well established. United States v. Cantu, 87 F.3d 1118, 1120 (10th Cir. 1996). We consider the evidence in the light most favorable to the prevailing party, here the government, and accept the district court's factual findings unless clearly erroneous. Id.; United States v. Anderson, 114 F.3d 1059, 1063 (10th Cir. 1997). But, the "ultimate determination of reasonableness under the Fourth Amendment is a question of law reviewable de novo." United States v. McKissick, 204 F.3d 1282, 1296 (10th Cir. 2000). The defendant bears the burden of establishing that the challenged stop violated the Fourth Amendment. United States v. Long, 176 F.3d 1304, 1307 (10th Cir. 1999). Because we conclude Dooley's initial stop of the van and its continued detention was supported by reasonable suspicion, we affirm.

**A**

"This case returns the court to familiar geographic and legal territory; we have frequently been called upon to assess the legality of investigatory stops made by the Border Patrol near the New Mexico-Mexico border." United States v. Monsisvais, 907 F.2d 987, 989 (10th Cir. 1990). Consistent with the Fourth Amendment's prohibition against unreasonable searches and seizures, Border Patrol agents on roving patrol are permitted "to stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" that the occupants are involved in criminal activity. Cantu, 87 F.3d at 1121 (quoting United States v. Brignoni-Ponce, 422 U.S. 873, 884 (1975)). Reasonable suspicion does "not

-6-

rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." United States v. Arvizu, 534 U.S. 266, 274 (2002). Rather, "reasonable suspicion represents a 'minimum level of objective justification.'" United States v. Mendez, 118 F.3d 1426, 1431 (10th Cir. 1997) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)).

In determining whether there is reasonable suspicion to stop a car in the border area, officers may consider any number of factors, including:

> (1) [the] characteristics of the area in which the vehicle is encountered; (2) the proximity of the area to the border; (3) the usual patterns of traffic on the particular road; (4) the previous experience of the agent with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade officers; (7) aspects of the vehicle, such as a station wagon with concealed compartments; and (8) the appearance that the vehicle is heavily loaded.

Monsisvais, 907 F.2d at 990 (citing Brignoni-Ponce, 422 U.S. at 884-85).

When evaluating an officer's decision to stop a vehicle, a court may not engage in a "sort of divide-and-conquer analysis" by evaluating and rejecting each factor in isolation. Arvizu, 534 U.S. at 267; United States v. Gandara-Salinas, 327 F.3d 1127, 1130 (10th Cir. 2003). This is because factors that, by themselves, may be "consistent with innocent travel" may collectively amount to reasonable suspicion. Arvizu, 534 U.S. at 274-75 (quoting Sokolow, 490 U.S. at 9). Rather, "the totality of the circumstances – the whole picture – must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411,

-7-

417-18 (1981). "In all situations the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling." Brignoni-Ponce, 422 U.S. at 885.

The district court found the majority of the Brignoni-Ponce factors satisfied in this case. Dooley testified that he encountered the van only 85 miles from the border in an area frequented by smugglers. Traffic on I-10 was especially heavy that day relative to the traffic on I-25; inspections at the I-10 checkpoint were minimal, but all vehicles were being stopped at the I-25 checkpoint. Highway 26 is also a well known "circuitous" route typically used by smugglers to avoid Border Patrol checkpoints located on nearby I-10 and I-25. The van displayed a temporary Texas tag, and when approached by Dooley, its driver and passenger stiffened up, looked straight ahead, and avoided eye contact. Dooley also observed other bodies in the back of the van; one sitting up, and the other "diving" down. Vans typically are used to carry illegal aliens and conceal contraband.

Cheromiah disputes that Dooley had reasonable suspicion to stop the car because he knew "absolutely nothing about where the van had been at the time he pulled it over." She insists that there was no indication that the van was heavily loaded – the eighth Brignoni-Ponce factor – and that the temporary tag carried little, if any, significance. She observes that avoiding eye contact is not suspicious behavior, see United States v. Barbee, 968 F.2d 1026, 1028 (10th Cir. 1992), and that behavior consistent with lawful driving, e.g., staring straight ahead, does not give rise to reasonable suspicion. United States v. Peters, 10 F.3d 1517, 1522 (10th Cir. 1993). Finally, she argues that the behavior of the passengers in the back of the van did not suggest that they were reacting to Dooley,

-8-

arguing that "diving down could just as easily be described as bending down to pick something up."

We have rejected any segmented analysis that "evaluat[es] and reject[s] each factor in isolation." Gandara-Salinas, 327 F.3d at 1130. Moreover, we have previously upheld stops in the same area occurring under similar circumstances. For example, in United States v. Quintana-Garcia, 343 F.3d 1266, 1272 (10th Cir. 2003), we held that a Border Patrol agent had reasonable suspicion to stop a Chevy Suburban with Mexican license plates traveling along Highway 26, a known "back door route" for smugglers, that slowed considerably when its occupants saw the Border Patrol vehicle that eventually stopped it. Similarly, in United States v. Barbee, 968 F.2d 1026 (10th Cir. 1992), we upheld the district court's finding of reasonable suspicion when the agents observed the defendant's car traveling north on a known smuggling route and further observed the car passengers crouching down out of sight after the agents followed the car and shined their high beam lights on it. We reasoned that two agents with experience in the area had testified about "the location of the road, the typical nature of the traffic at that time of year and that time of day . . . , and their experience with alien and drug smugglers." Id. at 1029.[3] The van in this case was also encountered on a "back door route," passengers in

---

[3] Two unpublished orders are also illustrative. In United States v. Martinez-Legarda, 102 Fed. Appx. 652, 2004 WL 1551597 (10th Cir. July 12, 2004), we upheld the stop of sports utility vehicle with Texas license plates that had recently crossed the border near El Paso traveling on Highway 26, taking an apparently circuitous route to I-10, presumably to avoid the checkpoint. Likewise, in United States v. Pena-Hernandez, 182 F.3d 934, 1999 WL 194139 (10th Cir. April 8, 1999) we upheld the stop of a van that had recently crossed the border near El Paso traveling a circuitous route from El Paso to

the rear of the van were seen diving down, and the van displayed temporary tags. On consideration of the totality of the circumstances, it was reasonable for Dooley to stop the vehicle to question its occupants. Cheromiah's challenge to the stop fails.

**B**

Cheromiah also argues that, even if Dooley's initial stop of the van was permissible, the investigative detention exceeded the scope of the stop. Investigative detention of a vehicle and its occupants must be reasonably related in scope to the circumstances that justified the stop. United States v. Holt, 264 F.3d 1215, 1220 (10th Cir. 2001) (en banc). Border Patrol agents who stop a vehicle based on a reasonable suspicion that the vehicle contains illegal aliens ordinarily may question the vehicle's occupants about their citizenship and their travel route, and may ascertain whether other individuals are inside. See id. at 1221 (a police officer ordinarily may ask a stopped motorist questions about the motorist's travel plans because those plans usually will relate to the purpose of the stop); United States v. Millan-Diaz, 975 F.2d 720, 722 (10th Cir. 1992) (border patrol agent's reasonable suspicion that defendant was smuggling illegal aliens was dispelled once agent determined no one else was in the vehicle with the defendant). Occupants of a vehicle may be detained further if, during the course of a roving patrol stop, the Border Patrol agent develops an objectively reasonable and articulable suspicion that the occupants are engaged in some other illegal activity, or if the encounter becomes consensual. United States v. Rosborough, 366 F.3d 1145, 1148

Deming, presumably to bypass checkpoints.

(10th Cir. 2004).

In this case, the district court determined that "the purpose of the stop was to determine whether . . . the van carried illegal aliens." The court found that although Dooley was able to see Cheromiah and the juvenile female from the driver's side window, he opened the sliding door because he "needed to see whether anyone was hiding in the back of the van." Id. On that finding, the district court concluded that "Dooley acted within the permissible scope of the stop when he opened the sliding door." Id.

Cheromiah argues that the district court's finding that Dooley opened the side door to the van to ascertain whether anyone else was in the back of the van was clearly erroneous because it was without support in the record. Specifically, she insists that once Dooley confirmed all four occupants were U.S. citizens while he was standing at the driver's window, he "did [not] have any reason to believe that additional persons were in the van. He did not see or hear anything that might suggest the presence of others." This, as the government observes, is not true.

On cross-examination, Dooley testified that he could not observe the entire inside space of the van because "some of the view of the van is going to be blocked by the driver, the driver's seat. Am I going to get a clear view of all the way down the right side to the very back? No." Thus, although Dooley testified that he could see four occupants in the van and believed their statements that all were United States citizens, he could not ascertain that no one else was in the vehicle until he opened the side door. The district

-11-

court's finding that Dooley opened the side door to confirm that no one else was in the van is supported by the record and is not clearly erroneous. Cheromiah concedes that Dooley smelled dryer sheets once he opened the sliding door; that odor created reasonable suspicion that drugs were present. Once reasonable suspicion existed, Dooley's continued detention of the vehicle was reasonable.

## III

Because Dooley's initial stop of the van and its continued detention was supported by reasonable suspicion, we **AFFIRM** the judgment of the district court.