**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with

Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued December 16, 2008
Decided February 12, 2009

**Before**

TERENCE T. EVANS, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 08-1662

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, | Appeal from the United States District Court for the Central District of Illinois. |
| *v.* | No. 07-CR-40014 |
| WILLIS DICKERSON, *Defendant-Appellant*. | Michael M. Mihm, *Judge*. |

**ORDER**

Willis Dickerson was pulled over in his van a little after midnight because police suspected that he had just been involved in a drug deal. The police officer ordered Dickerson out of his van and told him to lean against a squad car to be frisked. But as the officer was about to begin the frisk, Dickerson dropped a bag of crack from his pocket. The officer arrested Dickerson and discovered more crack in his shoe, and a later search of the van turned up a crack pipe and a digital scale coated with crack residue. Dickerson pleaded guilty to possessing crack with intent to distribute, 21

U.S.C. § 841(a)(1), but reserved the right to challenge on appeal the district court's denial of his motion to suppress. Dickerson argues that the officer did not have reasonable suspicion to frisk him, and thus the incriminating evidence should have been suppressed as fruit of an illegal search.

At the suppression hearing Rock Island Police Officer Shane Sharp testified that he was conducting late-night surveillance of a convenience-store parking lot after receiving complaints of drug dealing. While there, he saw what he suspected was a drug deal between two people, one in a truck and the other in a van. The van initially aroused his suspicion because, although many parking spaces close to the store's door were open, the driver parked far from the door and did not go inside. About ten minutes later, a truck arrived and parked next to the van. The driver exited and met briefly with the van's driver, then both vehicles departed. Sharp radioed Officer Norman Jacks, who was stationed nearby, and directed him to stop the van. Sharp told Jacks that he believed a drug deal had just occurred. Jacks, a veteran with nine years' experience and training in narcotics investigations, followed the van and stopped it after the driver turned right without signaling.

Officer Jacks testified that he ran a check on the van's license-plate number and learned it was registered to Dorothy Dickerson, a name he knew well because members of her family had committed drug and weapons offenses and were prone to violence. Jacks also saw the driver glance into his mirror and turn several times toward his console in a manner that was atypical of 90 percent of the traffic stops he had conducted. Jacks assumed that the driver was looking to see how many officers were present and where they were located and that the driver had turned toward the console to either retrieve or discard an item.

When the driver exited the van, Officer Jacks recognized him from prior dealings as Willis Dickerson and remembered that Dickerson had an alert in the police information system for weapons and violence. Once Dickerson was out of the van, Jacks announced that he was going to pat him down. Jacks instructed Dickerson to put his hands on the squad car and then, following procedure, placed a hand on Dickerson's back. Dickerson, though, ignored the officer and put his hands in his pockets. Twice more Jacks told him to put his hands on the squad car, but both times Dickerson put his hands back in his pockets after briefly palming the car. When Dickerson removed his hands from his pockets once more, Jacks heard what sounded like a coin hitting the ground. He looked down and saw what he suspected was crack cocaine in a clear plastic baggy. Dickerson ran; Jacks gave chase, tackled him, and, with

help from a second officer who had just arrived, arrested him after a short struggle. Jacks then searched Dickerson, and Officer Sharp searched the van.

In denying Dickerson's motion to suppress, the district court concluded that Officer Jacks had reasonable suspicion to stop the van both because of the traffic violation and the suspected drug transaction. But the court concluded that no frisk had occurred before Dickerson dropped the crack on the ground—not because Jacks didn't try, but because Dickerson had resisted. The court added, though, that a frisk would have been justified under the circumstances. On appeal Dickerson accepts that the stop of his van was lawful, but he maintains that he was frisked without reasonable suspicion and all of the evidence obtained after that point should have been suppressed.

We review determinations of reasonable suspicion de novo. *Ornelas v. United States*, 517 U.S. 690, 699 (1996). An officer may conduct a frisk for weapons if he can point to specific and articulable facts that the defendant may possess a weapon, thus presenting a risk of harm to the officers or to others. *Terry v. Ohio*, 392 U.S. 1, 29-30 (1968); *United States v. Shoals*, 478 F.3d 850, 853 (7th Cir. 2007). We look at the totality of the circumstances, not at each of the officer's reasons in isolation, when determining whether an officer had reasonable suspicion. *United States v. Arvizu*, 534 U.S. 266, 274 (2002). The analysis is objective and not limited to the officer's subjective rationale. *United States v. Barnett*, 505 F.3d 637, 639 (7th Cir. 2007). Instead, a reviewing court looks to the record as a whole to determine what the officer knew and whether that information would have made a reasonable officer suspicious. *United States v. Brown*, 232 F.3d 589, 594 (7th Cir. 2000). Relevant factors include the location of the stop, the suspect's characteristics and demeanor, and the officer's past experience, including knowledge about the particular suspect. *United States v. Jackson*, 300 F.3d 740, 745-46 (7th Cir. 2002).

When Dickerson exited his van, Officer Jacks immediately recognized him from prior dealings and remembered the alert tying him to violence and weapons. Any reasonable officer, therefore, would have believed that Dickerson might be a threat to his safety, especially because Dickerson had just left the scene of a suspected drug deal. *See United States v. Walden*, 146 F.3d 487, 491 (7th Cir. 1998); *see also United States v. Branch*, 537 F.3d 582, 589 (6th Cir. 2008) (noting that drug dealers commonly carry guns). In addition, it was after midnight, Jacks was alone, and Dickerson had been moving around in the van like he was either retrieving or discarding an item. Only after frisking Dickerson could Jacks continue his investigation without fear of violence.

*See Adams v. Williams*, 407 U.S. 143, 146 (1972); *United States v. Arnold*, 388 F.3d 237, 240 (7th Cir. 2004).

The government alternatively argues that no *Terry* frisk occurred because before the pat-down was accomplished Dickerson had already thrown his crack to the ground, giving Officer Jacks probable cause to arrest him and search him incident to the arrest. Given our conclusion that Jacks had reasonable suspicion to conduct a frisk before he announced his intention to do so, we need not reach this alternative rationale for upholding the district court's ruling.

AFFIRMED.