FILED
United States Court of Appeals
Tenth Circuit

April 24, 2014

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

CINDY LEE WESTHOVEN,

      Defendant - Appellant.

No. 13-2065
(D.C. No. 2:12-CR-01758-RB-1)
(D. N. Mex.)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **GORSUCH** and **MATHESON**, Circuit Judges.

United States Border Patrol Agent Joshua Semmerling stopped Cindy Lee

Westhoven in southern New Mexico on April 18, 2012. During the stop, Agent

Semmerling became suspicious and called for a canine unit to conduct a sniff of Ms.

Westhoven's vehicle. Before the sniff, he asked Ms. Westhoven to step out of her

---

[*]After examining Appellant's brief and the appellate record, this panel has
determined unanimously that oral argument would not materially assist the determination
of this appeal. See Fed. R. App. P. 34(a)(2) and 10th Cir. R. 34.1(G). The case is
therefore ordered submitted without oral argument. This order and judgment is not
binding precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed.
R. App. P. 32.1 and 10th Cir. R. 32.1.

vehicle.  The canine alerted to the truck, and the agents' subsequent search revealed marijuana in her vehicle.

A federal grand jury indicted Ms. Westhoven with possession with intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D).  Ms. Westhoven moved to suppress evidence of marijuana in her vehicle.   She argued the initial stop, her subsequent detention, and her de facto arrest all violated her Fourth Amendment rights.  The district court denied her motion to suppress.  Ms. Westhoven pled guilty to the indictment conditioned on her ability to appeal the district court's denial of her motion to suppress.  She timely filed her notice of appeal.

Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

## I.  BACKGROUND

### A. *Factual History*

The facts are undisputed.  On April 18, 2012, Agent Semmerling was patrolling Highway 80 in southern New Mexico approximately 45 miles from the Mexican border.  About an hour and 45 minutes into his shift, Ms. Westhoven drove past Agent Semmerling traveling in the opposite direction in a white Ford F-150 four-door truck.  Agent Semmerling, a border patrol agent for just over three years, testified that undocumented immigrant and drug smugglers used this road heavily due to the lack of border patrol checkpoints.  Apart from smugglers, he testified, locals mostly used the road.

As Ms. Westhoven drove past him, Agent Semmerling noticed she had a "stiff

posture" and her arms were "straight and locked out" at a "ten-and-two position on the steering wheel." ROA at 75. He also noticed the truck had an Arizona license plate and dark tinted windows. Although Ms. Westhoven did not appear to be speeding, Agent Semmerling decided to turn around to follow her and to run a registration check. He caught up with her after driving for a couple of miles at 95 miles per hour, indicating she had increased her speed 10 or more miles per hour. She then abruptly hit her brakes to slow down when Agent Semmerling was behind her.

From his registration check, Agent Semmerling learned the truck was from Tucson, Arizona. Because Highway 80 is not a direct route to Tucson, he became suspicious that Ms. Westhoven was involved in alien or drug smuggling. Agent Semmerling then turned on his patrol car lights to pull her over.

When he approached the driver's side of the truck, Agent Semmerling noticed Ms. Westhoven appeared to have scarring and acne on her right cheek, indicating to him she might be a methamphetamine user. He asked her where her travel began. She responded, "Bisbee—no. Douglas, not Bisbee." ROA at 90. She said she was heading to Tucson and had gone to Douglas, Arizona for shopping. Agent Semmerling noticed she seemed extremely nervous based on her stuttering and taking long pauses. Also, Agent Semmerling observed he had "never seen somebody shaking like that before in [his] experience." ROA at 93. He testified her answers also made him suspicious because Tucson had better shopping opportunities than Douglas, and driving on Highway 80 through New Mexico to go from Douglas to Tucson would add approximately 100 miles

to the trip.  He also noticed she had two cell phones—common for people engaged in illegal activity in the area.

Agent Semmerling asked for her driver's license and returned to his vehicle, calling for backup.  When he ran her identification for warrants and criminal history, he discovered no warrants but a conviction for shoplifting.  Agent Semmerling returned to Ms. Westhoven's truck, and she said, "I thought you were going to let me go.  Do you think I'm hauling illegal aliens?"  ROA at 97.  Agent Semmerling responded, "I don't know.  Can you roll down your window so I can see?"  *Id.*  She replied, "I don't think I want to do that."  *Id.* at 101.  She rolled down the window half an inch to retrieve her license.  Agent Semmerling could not see inside the back of her vehicle due to the tinted windows.  He asked if he could open the door to look in the back seat, but she said, "No."  *Id.* at 102.

Agent Semmerling then asked Ms. Westhoven to step out of her truck.  After Ms. Westhoven complied, Agent Semmerling called a canine unit to conduct a sniff test.  Agent Semmerling testified she was not under arrest at that time but she was being detained until a canine unit arrived on the scene.  He did not want her in the vehicle for officer safety reasons and to preserve any evidence.  Five to ten minutes later (less than 20 minutes after the stop began), a canine unit arrived, sniffed the truck, and alerted for the presence of a controlled substance.

A subsequent search revealed marijuana in the truck.  The agents then arrested and handcuffed Ms. Westhoven.

B. *Procedural History*

A federal grand jury indicted Ms. Westhoven on one count of possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(D). Ms. Westhoven filed a motion to suppress evidence of the marijuana found in her vehicle. She argued there was (1) no reasonable suspicion basis to stop her, (2) no reasonable suspicion to continue the stop for a canine sniff, and (3) no probable cause to effect a de facto arrest on her by detaining her and removing her from her vehicle. The district court held a suppression hearing and made factual findings. The court ultimately denied her motion to suppress, holding (1) there was reasonable suspicion of criminal activity sufficient to stop her; (2) the continuation of her investigative detention to conduct the canine sniff was based on reasonable suspicion; and (3) Ms. Westhoven was not arrested until after the agents discovered marijuana in her vehicle.

Ms. Westhoven pled guilty to a conditional plea agreement allowing her to withdraw her guilty plea subject to a successful appeal to this court. She timely filed her notice of appeal.

## II. **DISCUSSION**

### A. *Standard of Review*

In reviewing a district court's denial of a motion to suppress, we view the evidence in the light most favorable to the Government and accept the district court's factual findings unless clearly erroneous. *See United States v. Hunter*, 663 F.3d 1136, 1141 (10th Cir. 2011); *United States v. Karam*, 496 F.3d 1157, 1161 (10th Cir. 2007).

We review de novo the ultimate determination of the reasonableness of a search or seizure under the Fourth Amendment. *Karam*, 496 F.3d at 1161.

## B. *Reasonable Suspicion to Stop Ms. Westhoven*

Ms. Westhoven contends the district court erred when it determined Agent Semmerling had reasonable suspicion to stop her vehicle.

### 1. **Legal Background**

The Fourth Amendment protects against "unreasonable searches and seizures," U.S. Const., amend. IV, including investigatory stops and detentions, *see United States v. Sharpe*, 470 U.S. 675, 682 (1985); *United States v. Cheromiah*, 455 F.3d 1216, 1220 (10th Cir. 2006). Ms. Westhoven "bears the burden of establishing that the challenged stop violated the Fourth Amendment." *Cheromiah*, 455 F.3d at 1220.

Like other law enforcement officers, a border patrol agent must possess reasonable suspicion a law was violated to stop a vehicle: "Except at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" that the occupants have violated a law. *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975); *Cheromiah*, 455 F.3d at 1220.

In the border patrol context different facts may become relevant in developing reasonable suspicion than in other law enforcement circumstances. In deciding whether a border patrol agent had sufficient reasonable suspicion to stop a vehicle in compliance with the Fourth Amendment, we have considered:

-6-

> (1) characteristics of the area in which the vehicle is encountered; (2) the proximity of the area to the border; (3) the usual patterns of traffic on the particular road; (4) the previous experience of the agent with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade officers; (7) aspects of the vehicle, such as a station wagon with concealed compartments; and (8) the appearance that the vehicle is heavily loaded.

*United States v. Gandara-Salinas*, 327 F.3d 1127, 1130 (10th Cir. 2003) (quoting *United States v. Monsisvais*, 907 F.2d 987, 990 (10th Cir. 1990)); *see also Brignoni-Ponce*, 422 U.S. at 884-85.

We look at these factors as part of "the totality of the circumstances—the whole picture[]must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Cheromiah*, 455 F.3d at 1221 (quotations omitted). Although the factors, in isolation, may be "consistent with innocent travel . . . taken together they [may] amount to reasonable suspicion." *United States v. Sokolow*, 490 U.S. 1, 9 (1989). Officers and agents are "entitled to make an assessment of the situation in light of [their] specialized training and familiarity with the customs of the area's inhabitants." *United States v. Arvizu*, 534 U.S. 266, 276 (2002). Reasonable suspicion "need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.* at 274.

In *Arvizu*, the Supreme Court found reasonable suspicion for a traffic stop where a roving border patrol agent stopped a vehicle just north of Douglas, Arizona driving on a

-7-

remote, unpaved road with no border patrol checkpoints. 534 U.S. at 268, 277. The vehicle was travelling during a shift change, smugglers frequented the road, the driver's posture was stiff, the driver did not acknowledge the agent's presence as he drove by, children in the vehicle waved at him in an odd way for several minutes and had their knees up high as if they were propped up on something, and the car was registered to an address in Douglas, Arizona, "in an area notorious for alien and narcotics smuggling." *Id.* at 270-71. The Ninth Circuit did not find reasonable suspicion, reasoning that each behavior could be explained in innocent ways. The Supreme Court reversed. It recognized that each factor alone was susceptible to innocent explanation, but together the factors constituted a particularized and objective basis for stopping the vehicle. *Id.* at 275-77.

2. **Analysis**

The district court concluded Agent Semmerling had objectively reasonable suspicion to justify stopping Ms. Westhoven. Based on the totality of the circumstances, we agree.

The reasonable suspicion factors here included: (1) the stop location's characteristics, including proximity to the border; (2) traffic patterns on the road; (3) Ms. Westhoven's travelling during the border patrol shift change; and (4) Ms. Westhoven's driving behavior and vehicle characteristics.

First, Ms. Westhoven was driving in a relatively mountainous area 40-45 miles away from the U.S./Mexico border. Agent Semmerling, from his three years on the job,

knew this stretch of road, because of its terrain, proximity to the border, and lack of border checkpoints, had high activity for drug and undocumented immigrant smuggling. Agent Semmerling testified this road is one of the only ones leading from Douglas, Arizona, a border town known for smuggling, that does not have a border checkpoint. Thus, smugglers attempting to avoid the Border Patrol's detection frequent this road.

Second, Agent Semmerling knew out-of-state drivers rarely used the road. Ms. Westhoven's license plates indicated her truck was registered in Tucson, Arizona. The agent also knew that travelling on this road was particularly unusual for a Tucson driver because it added approximately 100 miles to the drive. The more direct routes had border checkpoints. These facts indicated smuggling activity.

Third, Border Patrol agents changed shifts between 6:00 p.m. and 8:00 p.m., and Agent Semmerling stopped Ms. Westhoven at 7:45 p.m. Smugglers frequently exploited that two-hour window. *See Arvizu*, 534 U.S. at 277.

Fourth, Agent Semmerling noticed as Ms. Westhoven was driving past him that she appeared stiff with elbows locked and hands in the ten-and-two position on the steering wheel. After he turned around, he had to drive significantly faster to catch up, indicating she increased her speed by an estimated 10 or more miles per hour after passing him. As he approached her vehicle from behind but before he turned on his

lights, she abruptly hit her brakes.[1]  These circumstances can contribute to reasonable

suspicion depending on context.  *See Arvizu*, 534 U.S. at 275-76 ("We think it quite

reasonable that a driver's slowing down, stiffening of posture, and failure to acknowledge

a sighted law enforcement officer might well be unremarkable in one instance (such as a

busy San Francisco highway) while quite unusual in another (such as a remote portion of

rural southeastern Arizona).").  The dark tinted windows on Ms. Westhoven's truck

raised Agent Semmerling's suspicion that she might be concealing something or someone

in the back of her truck.

This case is similar to *Arvizu*.  Driving stiffly, having tinted windows, slowing

down when seeing law enforcement, and driving in an out-of-the-way area may be

innocent conduct by themselves.  But when taken together along with driving a vehicle

with out-of-state plates in a mountainous smuggling corridor 40-45 miles away from the

border, we conclude Agent Semmerling had reasonable suspicion Ms. Westhoven was

involved in smuggling activity.  "It was reasonable for [Agent Semmerling] to infer from

his observations, his registration check, and his experience as a border patrol agent that

---

[1] Agent Semmerling testified that when he caught up to Ms. Westhoven, he paced her at 70 miles per hour and the speed limit was 60 miles per hour.  Although Ms. Westhoven's driving behavior can factor into reasonable suspicion, because border patrol agents do not have jurisdiction over New Mexico traffic laws, a traffic violation such as speeding cannot form the sole basis of reasonable suspicion.  *See* 8 C.F.R. § 287.8(c)(2)(i) ("An arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States."); *United States v. Barron-Cabrera*, 119 F.3d 1454, 1456, 1461 (10th Cir. 1997) (finding that a defendant's traffic violations only "partially satisf[ied] the 'driver's behavior' prong of *Brignoni-Ponce*").

[Ms. Westhoven] had set out . . . [on a] route used by smugglers to avoid the [border] checkpoint[s]" for a criminal purpose. *Arvizu*, 534 U.S. at 277.

Beyond the reasonable suspicion based on Agent Semmerling's stated reasons for stopping Ms. Westhoven, a traffic violation also supported reasonable suspicion for the stop. Agent Semmerling testified that after he turned around to follow Ms. Westhoven, he paced her at 70 miles per hour. The speed limit in the area was 60 miles per hour. "An observed traffic violation or a reasonable suspicion of such a violation under state law plainly justifies a stop." *United States v. Gregoire*, 425 F.3d 872, 876 (10th Cir. 2005) (citing *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc)). "Once an officer observes a traffic or equipment violation, a *Terry* stop is objectively justified, regardless of the detaining officer's subjective motives." *United States v. Winder*, 557 F.3d 1129, 1135 (10th Cir. 2009) (holding that a stop was reasonable based on an observed speeding violation even though the officer justified the stop on other grounds) (quotations omitted).

### C. *Reasonable Suspicion for Investigative Detention*

Ms. Westhoven contends that even if the initial stop were permissible, the district court erred when it determined Agent Semmerling had reasonable suspicion to extend the stop for a canine sniff.

### 1. **Legal Background**

An investigative detention of a vehicle and its occupants must be "reasonably related in scope to the circumstances which justified the interference in the first place."

*Botero-Ospina*, 71 F.3d at 786 (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). "Border patrol agents who stop a vehicle based on a reasonable suspicion that the vehicle contains illegal aliens ordinarily may question the vehicle's occupants about their citizenship and their travel route . . . ." *Cheromiah*, 455 F.3d at 1222. The detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality op.).

"Occupants of a vehicle may be detained further if, during the course of a roving patrol stop, the Border Patrol agent develops an objectively reasonable and articulable suspicion that the occupants are engaged in some other illegal activity . . . ." *Cheromiah*, 455 F.3d at 1222. Again, the totality of the circumstances determines whether there was reasonable suspicion sufficient to continue the detention. *See Arvizu*, 534 U.S. at 273.

2. **Analysis**

Agent Semmerling stopped Ms. Westhoven "for an immigration check to determine the citizenship of the driver and any passengers." ROA at 33. Ms. Westhoven contends once the agent determined she was not smuggling undocumented immigrants, further detention exceeded the scope of his original stop. We disagree.

After Agent Semmerling stopped Ms. Westhoven, he asked her several questions to discover whether she was smuggling undocumented immigrants. In the course of this discussion, additional facts came to light that, combined with the circumstances that led to the stop established reasonable suspicion that she was involved in criminal activity sufficient to justify continued detention for a canine sniff. We group these factors into

three categories: (1) the already-discussed factors that led to the stop, (2) Ms. Westhoven's statements and responses to Agent Semmerling's questions; and (3) Ms. Westhoven's nervousness and appearance.

First, many of the factors that supported reasonable suspicion to stop the vehicle also contributed to reasonable suspicion to continue the detention: Ms. Westhoven's Arizona license plates, her driving behavior, the nature of the area, travel patterns on the road, and the time of day.

Second, when Agent Semmerling asked Ms. Westhoven the origin of her travel, she responded, "Bisbee—no. Douglas, not Bisbee." ROA at 90. She also said she was heading to Tucson and had gone to Douglas for shopping. He thought this was suspicious because Tucson had better shopping opportunities than Douglas. Additionally, driving on Highway 80 to go from Douglas, Arizona, through New Mexico and back to Tucson, Arizona was a circuitous route that would add approximately 100 miles to the trip. *See United States v. White*, 584 F.3d 935, 951 (10th Cir. 2009) ("We have noted numerous times that implausible travel plans can form a basis for reasonable suspicion." (quotations omitted)). We weigh this factor heavily because it is the most unusual behavior Agent Semmerling noticed.

Third, Ms. Westhoven's nervousness and appearance contributed to reasonable suspicion. While he was asking her questions, Agent Semmerling thought she seemed extremely nervous because she was stuttering, taking long pauses, and visibly shaking more than he had ever seen. Although "everyone gets nervous when stopped by a police

-13-

officer," *United States v. Ludwig*, 641 F.3d 1243, 1249 (10th Cir. 2011), where "an individual's display of nervousness is unusually severe or persistent, or accompanied by other, more probative grounds for reasonable suspicion," it can contribute more heavily to the reasonable suspicion analysis, *United States v. Kitchell*, 653 F.3d 1206, 1220 (10th Cir. 2011) (quotations omitted). Because Agent Semmerling testified he had never seen someone shake that much, indicating extreme nervousness, we afford her nervousness some weight. Additionally, Agent Semmerling noticed Ms. Westhoven's appearance was consistent with that of a drug user, including acne and facial scars, indicating to him that she might be willing to engage in drug smuggling. Agent Semmerling also noticed she had two cell phones, which was, in his experience, common practice for drug smugglers.

Looking at these circumstances in totality, we agree with the district court that Agent Semmerling had reasonable suspicion to extend the detention.

## D. *De Facto Arrest*

Ms. Westhoven contends Agent Semmerling effectively arrested her when he asked her to step out of her vehicle and detained her for the duration of the canine sniff. She argues there was no probable cause for this arrest and thus the district court erred by not suppressing the evidence of marijuana found after the unconstitutional arrest.

### 1. **Legal Background**

"[T]he Supreme Court has identified three types of police/citizen encounters: consensual encounters, investigative stops, and arrests." *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (en banc) (quotations omitted). "Consensual encounters are

-14-

not seizures within the meaning of the Fourth Amendment . . . ." *Id.* (quotations omitted). For investigative stops, "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." *Sokolow*, 490 U.S. at 7 (quotations omitted). "[A]ctual arrests, which are characterized by a highly intrusive or lengthy search or detention, require that a reasonable officer would have probable cause to believe the arrestee has committed a crime." *United States v. Villagrana-Flores*, 467 F.3d 1269, 1273 (10th Cir. 2006) (quotations omitted).

If "an investigative detention . . . last[s] too long under the specific circumstances of a given case[,] . . . [it] may be transformed into a de facto arrest." *White*, 584 F.3d at 952-53. "In assessing whether a detention is too long in duration to be justified as an investigative stop, we . . . examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Sharpe*, 470 U.S. at 686.

2. **Analysis**

Although Agent Semmerling detained Ms. Westhoven and told her she was not free to leave before and during the canine sniff, we agree with the district court that this detention was not an arrest. Ms. Westhoven was arrested only after the agents discovered marijuana in her vehicle.

First, the detention before and during the canine sniff and the subsequent search of her truck lasted approximately 20-30 minutes. The length alone did not make this

detention a de facto arrest. *See Sharpe*, 470 U.S. at 686 (declining to accept a per se rule that 20-minute detention is a de facto arrest); *United States v. Cervine*, 347 F.3d 865, 872-73 (10th Cir. 2003) (upholding stop where stop leading to canine investigation lasted approximately 50 minutes).

Second, Agent Semmerling performed a reasonable and timely investigation to address his suspicions. *See Sharpe*, 470 U.S. at 686. He could not see into the back of Ms. Westhoven's truck. Suspecting smuggling activity, he asked to open her rear door to look inside, but Ms. Westhoven refused. Agent Semmerling promptly called for a canine unit to sniff Ms. Westhoven's vehicle. The canine unit arrived five to ten minutes later. In lieu of a physical search, a canine alert or lack of alert was likely to confirm or dispel Agent Semmerling's suspicions. He necessarily asked her to leave her vehicle and detained her before and during this search because he was concerned about destruction of evidence and officer safety if he allowed her to remain in the vehicle. *See Royer*, 460 U.S. at 504 ("[T]here are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigative detention."); *White*, 584 F.3d at 953 .

In sum, a canine sniff was a reasonable investigatory step to confirm or alleviate Agent Semmerling's reasonable suspicions, and the detention was just long enough to effectuate the canine sniff. This was not a de facto arrest that required probable cause.

## III.  CONCLUSION

For the foregoing reasons, we affirm the district court's denial of Ms. Westhoven's

motion to suppress.

ENTERED FOR THE COURT


Scott M. Matheson, Jr.
Circuit Judge