UNITED STATES of America,
Plaintiff,

v.

Ernesto SANTIAGO–GARCIA,
Defendant.

No. CR 09–231–TUC–RCC(BPV).

United States District Court,
D. Arizona.

Sept. 10, 2009.

Serra Marie Tsethlikai, U.S Attorney's Office, Tucson, AZ, for Plaintiff.

Stephen G. Ralls, Law Office of Stephen G. Ralls, Tucson, AZ, for Defendant.

## ORDER

RANER C. COLLINS, District Judge.

The Court has reviewed the record from Ernesto Santiago–Garcia's hearing before the Magistrate Judge. The Court has read in its entirety the transcript of the proceedings, the testimony given therein, as well as the memorandum submitted by counsel. The Court has reviewed the Report and Recommendation written by the Magistrate Judge. The Court is in agreement with the Magistrate Judges' conclusion. Several things leap out at the Court, some of which I shall expound upon.

■ The Court finds it difficult to take all of Agent Celaya's testimony at face value because of the paucity of the report that he prepared, and he is the primary witness against the defendant. The Court finds that the only facts that raised Agent Celaya's suspicion of Mr. Santiago–Garcia was,

1. That he had difficulty communicating with the vender, and;

2. The fact that he and the group he was with split up.

It is not this Court's understanding that people who go to gun shows have to always stay together and that they cannot split up. It is also not this Court's understanding that people who go to gun shows must be able to converse with a vendor in English.

Yet the suspicions that Agent Celaya talks about all arise out of those very facts. Agent Celaya goes down to the floor to determine what is happening and gets supposedly close enough to hear what the conversation is yet can relate none of the conversation about what the defendant is saying even though he is shoulder to shoulder and a Spanish speaker himself.

Agent Celaya then after watching the defendant purchase the ammunition with cash money, the cash being rolled up in his pocket, finds that also suspicious because he carries it in his pocket and not folded up. (The Court, by the way, carries its money in his pocket).

He then says that Mr. Santiago–Garcia goes over to a refreshment area where the other people are waiting. As that's being done he follows him to the area and he's already calling for assistance. (Before the bag switch). He then follows them outside after watching the ammunition being put in a bag, he claims, and watches them go get into their car with Arizona license plates.

Now with the car running, Agent Celaya taps on the window and displays his badge. Mr. Santiago–Garcia rolls down the window, seeing the badge and in response he asks him if he can speak to him in Spanish, which he does. Very few people believe that when a police officer taps on the window and displays his badge that they have the right to drive off. Very few people believe that when a police officer asks them if they can speak to them, that they have the right to say no. People believe that when an officer asks you to get out of the car that you are not free to leave whenever you wish. Particularly

when the officer now has your keys and has turned off the car.

Agent Brostko testified that straw purchases of ammunition was not an issue because dealers are not required to fill out a ATF form 4473.

The Court finds in every respect that the Magistrate Judge was correct in its ruling. There was no founded suspicion, there was no reason whatsoever for Agent Celaya to approach this gentleman. The arrest was without probable cause.

**IT IS ORDERED ADOPTING** the Magistrate Judges' Report and Recommendation (# 45).

**IT IS FURTHER ORDERED GRANTING** Defendant's Motion to Suppress (# 13) and the statements and evidence are suppressed.

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

BERNARDO P. VELASCO, United States Magistrate Judge.

On January 24, 2009, Defendant Ernesto Santiago–Garcia, a Mexican national visiting the United States on a B 1–B2 visa, was arrested as a prohibited possessor of ammunition in violation of 18 U.S.C. §§ 922(g)(5)(B) and 924(a)(2). The Defendant was indicted on February 18, 2009 [Doc. 6]. On April 21, 2009, Defendant filed a Motion to Suppress Evidence and Statements [Doc. 13]. The Government filed its Response on May 5, 2009 [Doc. 16].

The matter came on for Evidentiary Hearing before the Court on May 26, June 1, and June 15, 2009. The Government called as witnesses: Bureau of Alcohol, Tobacco, and Firearms (ATF) Special Agent in Charge Sigberto Celaya; ATF Agent Paul Brostko; and ATF Special Agent Rustin Wayas. The defense called as witnesses Adolfo Ruiz[1], Defendant Ernesto Santiago–Garcia, and Ernesto Santiago–Celaya.

The Court, having considered the briefing, arguments, and evidence presented, recommends that the District Judge, after his independent review and consideration, enter an order **GRANTING** Defendant's Motion to Suppress Evidence and Statements [Doc. 13].

### F*ACTS*

On January 24 and 25, 2009, a gun show was held at the Tucson Convention Center (TCC). ATF and the Tucson Police Department were working together in a joint operation in an attempt to identify persons illegally purchasing, possessing, or transferring firearms and ammunition.

ATF SAC Celaya, working in an undercover capacity, was surveilling the TCC arena from an observation station. At some point, Agent Celaya focused his attention on three Hispanic males, who were in the company of a male teenager and a young boy. One of the men was looking over the various booths. Eventually, Agent Celaya moved away from the observation station to stand next to the Defendant, who was gesturing towards the ammunition boxes. The salesman responded by stating the price for each type of ammunition. The Defendant was speaking Spanish. The salesman spoke English. Eventually, the Defendant purchased the ammunition at issue herein. The Defendant and his son approached another member of their group and the ammunition was placed in a carrying bag. At that point, the men left the TCC arena.

Agent Celaya decided to follow the group and called for his colleagues to assist him in the parking lot. At that time, Agent Celaya was suspicious because:

---

1. The witness, Adolfo Ruiz, probably has the nickname of Fito and not Pito.

1) The Defendant had a hefty wad of cash.

2) The Defendant had given ammunition to another member of the group, *i.e.* a possible straw purchase.

3) The ammunition was quickly placed in a bag.

4) The Defendant left the area immediately after purchasing the ammunition.

As Agents Celaya and Paul Brostko followed the group, they observed them get into a minivan with an Arizona license plate. Agent Celaya went to the driver's side door of the minivan, and Agent Brostko went to the passenger's side. Both agents displayed their badges as they knocked on the windows of the van. At that time, the Defendant had already started the vehicle and the engine was running. Agent Celaya told the Defendant in English that he wanted to speak with him. The Defendant asked if the agent could speak Spanish.

Agent Celaya testified that he did not recall whether he asked the Defendant to get out of the van. He believes the Defendant got out when Celaya told him that he wanted to talk to him. Agent Celaya originally testified on May 26, 2009, that he believed the Defendant shut off the van. He later testified that he had no recollection of whether the van was turned off. He did recall grabbing the keys after he determined that the Defendant was a prohibited possessor of ammunition. On June 1, 2009, ATF Special Agent Rustin Wayas testified that, as he approached the scene prior to any investigation, Agent Celaya turned off the vehicle and took the keys. Agent Brostko testified on June 1, 2009, that he observed the same thing. When Agent Celaya testified on June 15, 2009, he had a specific recollection of turning the vehicle off for safety reasons.

As each person exited the vehicle, they were directed to specific areas around the van. The Defendant was removed from the van to an area approximately 15 feet away. Agent Celaya asked the Defendant for identification. The Defendant produced a B 1B2 visa (border crossing privileges). From this information, Agent Celaya knew the Defendant was not a lawful permanent resident and therefore was a prohibited possessor of ammunition. Agent Celaya talked with the Defendant about his purchase of the ammunition, its current location, and Defendant's further plans for the ammunition. The Defendant was not read his Miranda rights until after the conclusion of his interrogation by Agent Wayas or, as the Defendant said when asked about Miranda: "I don't know who Miranda is."

As a result of the seizure, the agents determined that:

1) One Hispanic male was illegally in the United States.

2) The Defendant possessed $2,600.00 in cash.

3) The Defendant illegally purchased and possessed the ammunition.

### DISCUSSION

■■■ In *U.S. v. Cortez,* this Court (albeit as a lawyer) was specifically told:

"An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."

449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) (citations omitted). In applying this standard, Courts are instructed to look at the totality of the circumstances, giving due weight to the law enforcement officer so long as the articulation of the circumstances at hand are more than a hunch. *U.S. v. Montero–Camargo,* 208 F.3d 1122, 1131 (9th Cir.2000). In determining whether law enforcement has reasonable suspicion for an investigatory

stop, the Courts look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. *U.S. v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).

The Government contends that Tucson, Arizona, because of its proximity to Mexico, has many Hispanic people, some who are here legally and some who are here illegally. The Government also seems to contend that Hispanics who speak only Spanish can be suspicious to law enforcement. However, one must acknowledge that a lawful permanent resident is not required to speak English and that only prospective candidates for citizenship must speak English.

Taken as a whole, the evidence demonstrates that a Spanish-speaking family group of Hispanics in a vehicle registered in Arizona purchased a small amount of ammunition. The calibers of said ammunition, ranging from .17 caliber to 30/06, did not suggest illegal drug activity. The ammunition in the quantities purchased are not suspicious. The purchase screams domestic use, especially at a time when firearms dealers are having a difficult time keeping up with the demand for ammunition.

This Court is unable to find any support for Agent Celaya's seizure of Defendant, especially when testimony suggests that 20% of the gun show crowd is of Hispanic ethnicity or a race other than white. Further, even considering the totality of the circumstances, there was no "particularized and objective basis" for suspecting legal wrongdoing, unless being Hispanic and speaking Spanish while making a purchase amounts to the same. Agent Celaya was concerned about a straw purchase of ammunition. This cannot be considered too seriously because no records are kept for the purchase of ammunition. Therefore, any person could buy ammunition for an-

other person without the need of a straw person. A straw purchase is a person with a clean record buying a firearm for a person without a clean record. Under the current scenario, if this Magistrate attended a gun show to purchase ammunition, he better take Judge Fields with him, and not this Magistrate's brothers.

■ Further, assuming Agent Celaya had a founded suspicion to briefly detain the minivan occupants, he did not have enough articulable information to conduct such an enhanced detention amounting to an arrest. Agents Celaya and Brostko displayed their badges and Agent Celaya told the driver that he wanted to talk to him. After the Defendant exited the vehicle, Agent Celaya turned off the minivan and kept the keys and the Defendant's identification. If the Defendant left without his identification, he would not be able to prove that he was legally in the United States. As this occurred, Agent Brostko directed the passengers to various locations around the minivan, the purpose of which was to obtain separate unrehearsed responses from the detainees. Obviously, this was something more than a brief investigatory seizure. This conduct objectively demonstrated that, not only was the Defendant not free to leave, but Agent Celaya was the only person that could make that decision. At the time that Agent Celaya detained and separated the Defendant from his vehicle and companions, he did not have any objective evidence to justify the arrest of the Defendant.

The Court has reviewed Counsels' post-hearing memoranda and acknowledges the extensive work performed by Counsel, both pre- and post-hearing. The Court appreciates the vigorous advocacy of Counsel.

Under either of the Government's statement of facts, Agent Celaya had no found-

ed suspicion for detaining the Defendant. The Court finds suspect the Government's proposition that the ammunition being quickly placed in a bag was suspicious. The Court is unaware that there are legitimate or illegal ways of placing items in a bag, especially when there is no evidence of furtive conduct, i.e. looking around as the ammunition is placed in the bag. The Court also expresses some disbelief that a person who purchases something at a venue or goes in for a specific purpose is required to remain at that venue for an undetermined "legitimate" period of time. This rule does not seem to apply at gas stations, grocery stores, firearms stores, or public restrooms. In this Court's experience, a person goes somewhere to purchase an item, purchases it, and then leaves.

The Government has cited a number of cases that allow very restrictive measures pursuant to stops based on founded suspicions. These cases do not apply to seizures on something less than founded suspicion. Agent Celaya had a hunch, and nothing more. A hunch does not justify the activity that took place in this instance.

This situation could have gone much differently if Agent Celaya had a little more respect for the Fourth Amendment and had used his head more thoughtfully. For example, Agent Celaya could have displayed his badge; the Defendant could have rolled down his window; Agent Celaya could have asked the Defendant if he lived in Mexico; the Defendant might have said yes. Probable cause would have been established and the occupants could then be removed from the minivan, the engine turned off, and the keys taken. Instead, Agent Celaya effectively placed Defendant under arrest without probable cause, failed to advise him of his rights, and turned him over for questioning to Agent Wayas without telling him that the Defendant had not been Mirandized. The Defendant said it best when he testified: "I don't know who Miranda is." According to the facts presented to this Court, there is no reason he should, but he should have been made aware of Miranda.

## CONCLUSION

It is the recommendation of this Court that the District Judge, after his independent review and consideration, enter an Order **GRANTING** Defendant's Motion to Suppress Evidence and Statements [Doc. 13].

Pursuant to 28 U.S.C. § 636(b)(1)(B), the parties have ten (10) days from the date of this Report and Recommendation to file written objections to these findings and recommendations with the District Court. Any objections filed should be filed as **CR 09–00231–TUC–RCC.**