[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-11883
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 27, 2010
JOHN LEY
ACTING CLERK

D. C. Docket No. 08-60312-CR-WPD

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TRAVIS L. WILLIAMS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(January 27, 2010)

Before CARNES, MARCUS and FAY, Circuit Judges.

PER CURIAM:

Travis L. Williams appeals from his conviction for possession of a firearm as a convicted felon. On appeal, he argues that the district court clearly erred by crediting Detective Carlton Smith's testimony that he saw the butt of a gun sticking out of his jeans pocket, and thereby erred in denying his motion to suppress. Williams asserts that Smith's testimony lacked credibility because: (1) Williams was wearing a long football jersey, which covered his jeans pockets and would have prevented Smith from seeing a gun in his pocket; and (2) Smith did not remove his gun from its holster when he chased Williams, but would have done so if he had truly believed that Williams was armed. For the reasons set forth below, we affirm.

## I.

In October 2008, a federal grand jury charged Williams with: (1) possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) ("Count 1"); and (2) possession of marijuana, in violation of 21 U.S.C. § 844(a) ("Count 2"). Williams initially entered a plea of not guilty.

Thereafter, Williams filed a motion to suppress the firearm that was the subject of Count 1. In his motion, Williams explained that, on February 20, 2008, police officers stopped him, arrested him, and seized his gun. He asserted that the seizure of the gun was not justified under the plain view doctrine because Smith

2

could not have clearly seen a gun sticking out of his jeans pocket. Williams argued that Smith's assertion that he had clearly seen a gun in Williams's pocket lacked credibility because he had been wearing a long football jersey that would have covered his jeans pockets.

The district court held a hearing regarding Williams's motion to suppress. At this hearing, Smith testified that he was a detective employed by the Fort Lauderdale Police Department. At approximately 6:00 p.m. on February 20, 2008, Smith and other officers were searching for a narcotics suspect on 27th Avenue. During this search, Smith and Detective Joshua Mijal walked by the rear of a recording studio located on 27th Avenue. They saw that the studio's back door had been left slightly open, and that an individual was inside the studio. Smith pushed the back door further open, and saw that the individual was "standing in the doorframe drinking something from a plastic cup." Smith identified Williams as the individual he had seen inside the studio.

Smith further testified that, when he first saw Williams, he observed that the butt of a gun was sticking out of Williams's right jeans pocket. Just as Smith noticed the gun, Williams saw Smith, who was dressed in a police uniform. When Williams saw Smith, he turned around and fled further inside the studio. Although Williams was wearing a sports jersey, Smith was "clearly" able to see a weapon

3

protruding from his pocket.  After Williams began to run, Smith told Mijal that Williams had a gun, and they chased him through the studio.

Smith further testified that, during the chase, Williams tripped and fell to the floor.  Smith jumped on top of Williams, who kept reaching toward his pocket and moving his arms so that Smith and Mijal could not gain control of his wrists. During this struggle, a third detective arrived on the scene.  The three detectives struggled with Williams for several minutes before a fourth detective, Richard Rivera, arrived and subdued Williams with a taser.   After the detectives subdued Williams, but while he was still lying on the floor, the detectives spotted a handgun lying on the floor next to Williams.  The gun was lying "just outside" of Williams's right pocket.  During a search incident to arrest, the detectives found marijuana in Williams's left pants pocket.

On cross-examination, Smith identified a football jersey as the jersey that Williams was wearing on February 20, and the court admitted the jersey into evidence.  Smith could not remember how long the jersey was when he saw Williams wearing it.  When he first saw Williams, Smith had a gun in his holster. He did not remove the gun from his holster as he chased Williams.  On redirect examination, Smith testified that he was sure that he saw the butt of a gun in Williams's jeans pocket.

Mijal testified that he was employed as a detective by the Fort Lauderdale Police Department. Mijal testified consistently with Smith regarding the events of February 20. He explained, however, that he did not see a gun until after they subdued Williams. As Williams was being placed into custody, Mijal saw a gun lying on the floor.

On cross-examination, Mijal testified that Smith had a clear view inside the record studio when he opened the studio's rear door. Mijal had been standing behind Smith at this time. Mijal heard Smith say, "The guy has got a gun," and, immediately after Smith made this statement, they entered the record studio and chased Williams. Williams had been wearing an "oversized" football jersey. On redirect examination, Mijal explained that the gun that he saw lying on the floor was lying next to the area where Williams had been lying after he tripped and fell.

Rivera testified that he was also employed as a detective by the Fort Lauderdale Police Department. On February 20, he had assisted with a narcotics investigation near 27th Avenue. He had been assigned to sit in a police car and ensure that suspects did not flee the area. While sitting in his police car, Rivera received a message on his police radio that other detectives were chasing an armed individual through the record studio on 27th Avenue. Rivera went to the studio and entered it through its front door. Once inside, he saw three detectives

5

wrestling with Williams on the floor. He overheard a detective state that Williams was trying to reach for a weapon. Rivera instructed the other detectives to back away and, after they did so, he stunned Williams with a taser. Thereafter, the other detectives handcuffed Williams, and Rivera saw a weapon on the floor next to Williams, who was wearing a football jersey.

Rivera further testified that, while he and Smith took Williams to jail in a police car, Williams asked him if he could call his mother. Rivera dialed the telephone number and held a telephone up to Williams's ear so he could talk to his mother. During this conversation, Rivera told his mother that he had been holding a gun for someone while he was at the record studio, and that the police had caught him with the gun and some marijuana.

John Leahy, a special agent, testified that he had conducted a background investigation into Williams's case. During this investigation, he spoke with Alex Cruz, who managed the business unit that housed the record studio. Cruz had been present at the record studio on February 20, and, although he had seen Williams on that day, he did not see Williams with a gun.

On cross-examination, Leahy testified that he had also interviewed Selvyn Blair, who owned the record studio. Blair had been present at the studio on that day, and remembered that Williams's aunt, Stacey McCall, had dropped Williams

6

off at the studio.  Leahy explained that, based on its investigation, the police department had determined that the gun found at the record studio on February 20 was owned by McCall.

On redirect examination, Leahy clarified that Cruz had told him that he saw Williams walk toward the back door of the record studio just before he was chased by the police.  Cruz did not see a gun until after Williams's arrest.

Georgia Williams, Williams's mother, testified that Williams had been wearing jeans and a football jersey on February 20.  She remembered what Williams was wearing on that day because it was his father's birthday.  The jersey came down to Williams's knees.

On cross-examination, Georgia testified that when Williams called her on February 20, he told her that a gun had been inside the record studio, and that the police had tried to "blame it on him."  He told her that the gun belonged to a girl.

Joe Williams, Williams's brother, testified that Williams was wearing a long football jersey on February 20.  The jersey came down to Williams's knees and was a size 3X.  Joe explained that he was familiar with the jersey because he and Williams wore the same size, and often wore each other's clothes.

After the conclusion of the evidence, Williams argued that Smith could not have seen a gun in his pocket because he had been wearing a long football jersey

7

that would have covered the pockets of his jeans. The court noted that it would not make sense for Smith to tell Mijal that he saw a gun, and request back-up, if he had not actually seen a gun. The court reasoned that, in order to grant the motion to suppress, it had to find that several officers had lied when they testified that Smith had announced that Williams had a gun.

The district court denied the motion to suppress. The court made the following factual findings. Smith saw the butt of a gun sticking out of the right pocket of Williams's jeans. The court noted that Smith could have seen the gun through the mesh of the football jersey, or that perhaps the jersey had been tucked into Williams's jeans or hiked above his jeans pocket. The court further found that Williams fled from Smith, and that Smith informed Mijal that Williams had a gun. After his arrest, Williams called his mother and told her that he had been caught by the police while he was holding a gun for someone. The gun was eventually traced to Williams's aunt. Based on these facts, the court found that, upon seeing the butt of the gun in Williams's pocket, Smith had probable cause to arrest Williams for carrying a concealed firearm, in violation of Fla. Stat. § 790.01. In the alternative, the court found that Smith had a well-founded suspicion to conduct a *Terry*[1] stop of Williams and, once lawfully stopped, he could seize Williams's gun because it was

---

[1] *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968).

8

in plain view.

Williams and the government subsequently entered into a plea agreement, whereby Williams agreed to plead guilty to Count 1 of the indictment.

At his guilty plea hearing, Williams pled guilty to Count 1, and the government stated that it would move to dismiss Count 2 at sentencing. The court confirmed with the parties that Williams's entry of a guilty plea was conditional on his being able to appeal the district court's denial of his motion to suppress.

The court sentenced Williams to 37 months' imprisonment.

### III.

"A district court's ruling on a motion to suppress presents a mixed question of law and fact." *United States v. Zapata*, 180 F.3d 1237, 1240 (11th Cir.1999). We review the district court's factual findings for clear error, and its application of the law to the facts *de novo.* *Id.* "[A]ll facts are construed in the light most favorable to the prevailing party below." *United States v. Bervaldi*, 226 F.3d 1256, 1262 (11th Cir.2000). "The individual challenging the search has the burdens of proof and persuasion." *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir.1998). We will defer to the district court's credibility determination unless the court credited testimony that was "unbelievable." *United States. v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002) (quotation omitted).

"The Fourth Amendment protects individuals from unreasonable searches and seizures by government officials, and its protections extend to brief investigatory stops of persons or vehicles." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002) (quotation omitted). For brief investigatory stops, "the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot." *Id.* (*quoting Terry*, 392 U.S. at 30, 88 S.Ct. at 1884-85). When determining whether reasonable suspicion exists, courts must consider the totality of the circumstances to determine whether the police officer had a "particularized and objective basis for suspected legal wrongdoing." *Arvizu*, 534 U.S. at 273, 122 S.Ct. at 750. Under the plain view doctrine, an officer may seize an object for which he does not have a warrant if: (1) he is lawfully in an area where the object is in his plain view; and (2) the incriminating nature of the object is immediately apparent. *United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006). Under Florida law, it is illegal for anyone to carry a concealed firearm unless they possess a license to do so. Fla. Stat. § 790.01(2) and (3).

Finally, we note that arguments not raised on appeal are abandoned. *United States v. Cunningham*, 161 F.3d 1343, 1344 (11th Cir. 1998)

Here, the district court did not clearly err in crediting Smith's testimony that

10

he saw the butt of a gun sticking out of Williams's jeans pocket. While there was ample testimony that Williams wore a long football jersey on February 20, the court determined that it was possible that Smith saw the butt of the gun through the mesh material on Williams's jersey. The court also noted that it was possible that Williams's jersey had been tucked into his pants or hiked above his right pocket, leaving the gun exposed. Furthermore, Smith consistently testified that he was certain that he saw the butt of a gun in Williams's pocket.

Moreover, even though none of the other detectives saw a gun in Williams's pocket, they corroborated Smith's testimony by testifying that: (1) Smith warned Mijal that Williams had a gun; (2) a gun was lying on the floor of the recording studio next to the area where Williams had been lying after he tripped and fell; (3) the police radio system relayed a message that back-up assistance was needed at the recording studio because an armed individual had fled from detectives; (4) Williams told his mother that the police had caught him with a gun; and (5) the gun found next to Williams at the recording studio was owned by his aunt, who had dropped him off at the studio that morning. Because it was not improbable that Smith could have seen a gun in Williams's pocket even though he was wearing a long football jersey, and Smith's testimony was corroborated by the testimony of the other detectives, the court did not clearly err in crediting Smith's testimony that

11

he saw a gun in Williams's pocket. While Williams argues that Smith would have removed his gun from its holster for protection if he had truly believed that Williams was armed, the fact that Smith did not remove his gun from its holster does not render his testimony improbable.

Because Smith saw the butt of a gun in Williams's pocket, he possessed reasonable suspicion to suspect that Williams was carrying a concealed weapon, in violation of § 709.01. Thus, Smith's stop of Williams was lawful. Moreover, during the stop, Williams's gun was plainly visible to Smith, and its incriminating nature was apparent. Williams does not argue on appeal that Smith and Mijal acted unlawfully when they approached the recording studio and opened its rear door. Accordingly, Williams has abandoned any argument that Smith was not in an area where he lawfully could be when he saw the gun in Williams's pocket. Because it is not disputed that Smith and Mijal acted lawfully when they approached the recording studio and opened its rear door, and the district court did not clearly err in finding that a gun was in Smith's plain view, the seizure of Smith's gun was justified under the plain view doctrine. As a result, the court did not err in denying Williams's motion to suppress.

**AFFIRMED.**