Filed 3/26/13  P. v. Oropeza CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D061341 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD232801) |
| SERGIO OROPEZA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, John S. Einhorn and Frederick Maguire, Judges.  Affirmed.

INTRODUCTION

Sergio Oropeza pleaded guilty to transportation of more than four kilograms of cocaine not for personal use (Health & Saf. Code, §§ 11352, subd. (a), 11370.4, subd. (a)(2); Pen. Code, § 1210, subd. (a)), one count of possession of more than four kilograms of cocaine for sale (Health & Saf. Code, §§ 11351, 11370.4, subd. (a)(2)), one count of transportation of more than four kilograms of methamphetamine not for personal

use (Health & Saf. Code, §§ 11379, subd. (a), 11370.4, subd. (b)(2); Pen. Code, § 1210, subd. (a)), and one count of possession of more than four kilograms of methamphetamines for sale (Health & Saf. Code, §§ 11378, 11370.4, subd. (b)(2)).  The trial court sentenced him to five years in prison.

Before pleading guilty, Oropeza filed two motions to suppress the evidence against him:  an initial motion under Penal Code section 1538.5, subdivision (a), and a renewed motion under subdivision (i).  In the motions, he argued the officers who conducted the vehicle stop leading to his arrest lacked reasonable suspicion for the stop.  After considering the evidence of the circumstances prompting the stop, the trial court determined the officers had the requisite reasonable suspicion and denied the motions.

Oropeza appeals, contending we must reverse his convictions because the trial court erroneously denied his suppression motions.  We disagree and affirm the judgment.

BACKGROUND

On February 9, 2011, Border Patrol agents Miguel Perez and Henry Ballo were in a marked patrol car conducting anti-smuggling operations on Interstate 8 (I-8) near the Pine Valley checkpoint.  Perez had been a Border Patrol agent for almost nine years and had been part of the agency's smuggling interdiction group for three and a half years.  His training and experience included identification of driving behaviors indicative of illegal smuggling activity.

On this date, the checkpoint was closed due to the weather.  Perez explained it is common for smugglers to try to transport their contraband when a checkpoint is closed.  Around 9:15 a.m., the agents saw a white minivan with a Mexico license plate position

2

itself close to another vehicle as if attempting to hide from the agents' view. In addition, the minivan maintained its speed and closed the gap with the vehicle in front of it instead of slowing down as typically occurs when drivers encounter patrol vehicles.

The agents followed the minivan and drove alongside it, first on the left side then on the right side, for 10 to 12 minutes at about 60 miles per hour. Oropeza was the minivan's only occupant. He drove with his head straight, his body rigid, and his hands on the steering wheel in the 10:00 o'clock and 2:00 o'clock positions. Although he appeared to glance back and forth at the agents through the minivan's side and rearview mirrors, he never made eye contact with the agents or otherwise acknowledged their presence even though one of the agents attempted to make eye contact with him and the other agent lifted himself up off his seat to peer inside the minivan.

The minivan's license plate was dangling almost halfway off, with one bolt secure and the other wiggling back and forth as if it had been recently placed on the vehicle. The license plate was recently issued even though the minivan was an older model. Perez explained it is common for smugglers to switch license plates and use recently issued license plates to avoid detection when crossing the border.

The minivan's interior was very clean and the dashboard appeared to have been recently "wiped down." Perez explained smugglers typically avoid leaving handprints or grease prints that would make any work they had done to their vehicles' dashboards or backdoors stand out. It also appeared Oropeza only had the ignition key with him. Perez explained smugglers are often only given one key to open and drive the vehicle. They will not have house keys or other personal items in the car.

3

The agents checked the Department of Homeland Security records and learned the minivan had entered the country at 7:38 a.m. that day through the Calexico port of entry. From that information, Perez determined the minivan had not stopped since its entry, which is a common pattern of drug smugglers.

The agents pulled behind the minivan and slowed down to see how Oropeza reacted. While most drivers will go back to their normal speed when a marked patrol car backs away, Oropeza continued maintaining the same relatively slow speed without attempting to break away from the patrol car.

The agents then activated the emergency lights on their patrol car to signal Oropeza to stop and pull over. Oropeza did not stop and pull over immediately. Instead, he slowed down, exited the interstate, turned right and drove several hundred yards before coming to a complete stop. The stop seemed prolonged to Perez. He explained prolonged stops are indicative of smuggling activity because "in their mind, they're refreshing their story as to where they're going, their location, or what the reason for their visit or reason for [their] destination."

After the stop, the agents conducted a search of the vehicle and discovered a large amount of cocaine and methamphetamine concealed in the dash. The agents also found a single socket wrench behind the driver's seat, which was the right size to open the compartment where the drugs were hidden.

4

DISCUSSION

"In ruling on a motion to suppress, the trial court must find the historical facts, select the rule of law, and apply it to the facts in order to determine whether the law as applied has been violated.  [Citation.]  We review the court's resolution of the factual inquiry under the deferential substantial-evidence standard.  [Citation.]  The ruling on whether the applicable law applies to the facts is a mixed question of law and fact that is subject to independent review."  (*People v. Hoyos* (2007) 41 Cal.4th 872, 891, overruled on another ground by *People v. McKinnon* (2011) 52 Cal.4th 610, 637-643.)

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest.  [Citations.]  Because the 'balance between the public interest and the individual's right to personal security,' [citation], tilts in favor of a standard less than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity ' "may be afoot" '."  (*United States v. Arvizu* (2002) 534 U.S. 266, 273 (*Arvizu*).)

When making reasonable suspicion determinations, we "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing.  [Citation.]  This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' "  (*Arvizu*, *supra*, 534 U.S. at p. 273.)  "[C]ourts

5

do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." (*Illinois v. Wardlow* (2000) 528 U.S. 119, 124-125.)

Among the factors we consider in assessing the propriety of vehicle stops in border areas are: the location where the officer encountered the vehicle; the location's proximity to the border; the typical traffic patterns in the location; information about recent similar criminal activity in the location; the driver's behavior, including any obvious evasion attempts; and relevant aspects of the vehicle, such as its features, appearance, and occupancy. (*United States v. Brignoni-Ponce* (1975) 422 U.S. 873, 884-885.) We may not consider factors in isolation from one another. (*Arvizu*, *supra*, 534 U.S. at p. 274.) We also need not rule out the possibility of innocent conduct. (*Id*. at p. 277.)

In this case, the Border Patrol agents stopped Oropeza in an area of I-8 known for smuggling activity. They knew there was an increased probability smugglers would be on the interstate that day because of the checkpoint closure. They noticed Oropeza's minivan when he positioned it close to another vehicle as if attempting to avoid their view. They then drove their marked patrol vehicle alongside the minivan, first on the left side then on the right side, for 10 to 12 minutes while one agent attempted to make eye contact with Oropeza and the other agent lifted himself off of his seat to peer inside. Although Oropeza glanced back and forth at the agents through the minivan's side and

6

rearview mirrors, he never acknowledged or made eye contact with the officers. Instead, he kept his face forward, his body rigid, and his hands at the 2:00 o'clock and 10:00 o'clock positions on the steering wheel.

In addition, although Oropeza's minivan was an older model, its license plate was newly issued and dangled from one bolt as if hastily fastened. Oropeza also appeared to have only the ignition key with him and the minivan's dashboard appeared to have been recently wiped down. Moreover, once Oropeza crossed the border, he drove continuously. Then, when the agents initiated the vehicle stop, Oropeza did not pull over immediately. He prolonged the stop by driving off the interstate, around a corner, and several hundred yards before stopping.

Perez explained why his training and experience with smuggling interdiction caused him to suspect Oropeza of smuggling activity. Perez's explanations were rational and, considering them and Oropeza's actions collectively, we are satisfied the agents had the requisite reasonable suspicion to stop Oropeza's minivan.

Implicitly recognizing his conscious avoidance of the agents is one of the weightier factors against his position, Oropeza argues and cites various authorities for the proposition lack of eye contact may never be considered in determining the existence of reasonable suspicion. However, Oropeza's argument and authorities conflict with more recent United States Supreme Court authority allowing situational assessment of this factor. (See *Arvizu*, *supra*, 534 U.S. at pp. 275-276 [A driver's slowing down, stiffening of posture, and failure to acknowledge a sighted law enforcement officer may be unremarkable in one situation and quite unusual in another. An officer is entitled to

7

assess the situation in light of his or her specialized training and familiarity with the customs of an area's inhabitants.].)  In our view, Oropeza's conscious avoidance of the agents was far closer to being "quite unusual" than to being "unremarkable." Consequently, we conclude it was appropriately considered in determining the existence of reasonable suspicion in this case.

In addition to challenging the absence of eye contact as a factor, Oropeza extensively argues why each of the factors relied upon by the agents was consistent with innocent, rather than suspicious conduct.  However, the United States Supreme Court has specifically disapproved of a divide-and-conquer, factor-by-factor determination of reasonable suspicion in favor of a totality of the circumstances approach.  (*Arvizu*, *supra*, 534 U.S. at p. 274.)  The United States Supreme Court has also specifically recognized a series of acts, each possibly innocent, may warrant further investigation when considered collectively.  (*Id*. at pp. 274-275; *Illinois v. Wardlow*, *supra*, 528 U.S. at p. 125 [depending on the totality of the circumstances, even conduct susceptible to an innocent explanation may provide reasonable suspicion for a stop].)  " '[T]he relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of noncriminal acts.' "  (*United States. v. Sokolow* (1989) 490 U.S. 1, 10.)

While we do not doubt a person driving from Mexico into the United States under identical circumstances might not have any involvement with smuggling activity, the question before us is whether the person could be reasonably suspected of having such involvement for border patrol agents to conduct a constitutionally permissible

8

investigative detention. Because the totality of the circumstances demonstrates the agents in this case had a particularized and objective basis for suspecting Oropeza's involvement in smuggling, we conclude the trial court properly denied Oropeza's suppression motions.

DISPOSITION

The judgment is affirmed.


MCCONNELL, P. J.

WE CONCUR:

O'ROURKE, J.

AARON, J.