**F I L E D**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff-Appellee, | No. 05-2119 |
| v. | (D. of N.M.) |
| GABRIEL GUILLEN-ZAPATA, | (D.C. No. CR-03-210-JP) |
| Defendant-Appellant. | |

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **O'BRIEN**, and **TYMKOVICH**, Circuit Judges.[**]

Defendant-Appellant Gabriel Guillen-Zapata, a Mexican citizen without immigration documents, was apprehended in New Mexico near the border between the United States and Mexico driving a vehicle transporting 1,650 pounds of marijuana. Guillen-Zapata pled guilty in federal district court in the District of New Mexico to three counts: (1) conspiracy to possess marijuana with

---

[*] This order is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders; nevertheless, an order may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**] After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. *See* Fed. R. App. P. 34(a); 10th Cir. R. 34.1(G). The cause is therefore ordered submitted without oral argument.

the intent to distribute in violation of 21 U.S.C. §§ 841(a)(1)(A), (b)(1)(A) and 846; (2) possession with intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B); and (3) being found in the United States after having been deported as an alien convicted of an aggravated felony in violation of 8 U.S.C. §§ 1326(a)(1), (a)(2), and (b)(2). Guillen-Zapata appeals the denial of his motion to suppress statements and physical evidence. He argues that the district court erred in finding the Border Patrol agents possessed reasonable suspicion to stop his vehicle and contends that all evidence related to the stop should have been suppressed as fruit of the poisonous tree.

We take jurisdiction pursuant to 28 U.S.C. § 1291 and AFFIRM.

## I. **Background**

The Birchfield area is a five to seven mile stretch of desert in southern New Mexico, which runs along the Mexican border to the south and New Mexico Highway 9 to the north. Throughout the Birchfield area, Highway 9 parallels the border at a distance of 600 yards at its closest point and one mile at its farthest point. There are no ports of entry within the Birchfield area, and the nearest ports are approximately forty miles in either direction. There are no businesses or structures in the area and no paved roads except Highway 9. A number of illegal entries had been reported in the area in the three weeks prior to the traffic stop at

issue, and at least ten drug seizures had been conducted in the area within the three preceding years.

On December 19, 2002, at approximately 7:30 p.m., a vehicle sensor was triggered in the Birchfield area. The sensor had been placed between Highway 9 and the Mexican border at a point where the distance between the highway and border was approximately 600 yards. There was a dirt road running north and south that crossed Highway 9 at that point. The sensor was designed to detect vehicles driving off-road between the border and Highway 9, but it was possible to avoid the sensor by staying on the dirt road. Approximately an hour before the sensor's activation, Border Patrol agents had driven along the sensor area parallel to Highway 9 and marked out a path with their own tire tracks. That way, if another vehicle crossed their tracks afterward, they would be able to tell.

When this sensor was activated, Border Patrol Agent Juan Francisco Jimenez and his partner were parked about a mile west of the sensor's location. Officer Jimenez and his partner waited two or three minutes after hearing the alarm so they would not "spook" the vehicles that may have activated the sensor. Then, they moved up closer to the highway in order to see whether any vehicles had driven past. They observed the taillights of a vehicle that had just passed their position heading westbound on Highway 9. Agent Jimenez pulled onto the highway, radioed the information to other Border Patrol agents, and headed east

toward the sensor. As he did so, he saw the headlights of a second westbound vehicle approaching. Agent Jimenez identified the second vehicle, which was following closely behind the first, as "some type of utility truck." Tr. at 17. The two vehicles were headed away from the sensor, and the direction and time frame of both vehicles was consistent with having activated the sensor.

Agent Jimenez arrived at the sensor, having seen no other vehicles on the road between his initial point of observation and the sensor location. He saw fresh vehicle tracks of two or more vehicles leading from the sensor's location up to Highway 9. The tracks indicated that the vehicles had turned west onto the highway. After he radioed this information to other Border Patrol Agents, Agent Kevin McCrary, who was approximately four and half miles west of the sensor area, radioed back that he saw two "utility trucks like the kind the phone company uses" headed west approximately three car lengths apart. Tr. at 37. At the time these two vehicles passed his location, Agent McCrary estimated they were traveling between sixty and sixty-five miles per hour.

About seven miles west of the sensor, Border Patrol Agent Richard Duggan learned of the sensor's activation and the subsequent reports of fellow agents and headed east toward the sensor. When he passed two trucks that matched the descriptions provided by the other agents, Agent Duggan made a U-turn and headed west behind them. As soon as he did so, the lead truck sped up

considerably and distanced itself from the trailing truck. Agent Duggan thought this was suspicious, because, when he had passed them, they were traveling at the same speed approximately 100 yards apart. He pulled alongside the trailing vehicle and saw the driver, Guillen-Zapata, wearing a hard hat. Agent Duggan thought this was suspicious, because he had worked in construction and knew that hard hats were extremely uncomfortable and usually only worn while at a job site.

At that point, Agent Duggan slowed down and stopped the vehicle. As he approached the driver's window, he smelled creosote bush, which indicated that the utility truck had very recently been driven off-road. Agent Duggan knew that the only way to activate the sensor was to drive off-road. Agent Duggan asked the driver, Guillan-Zapata, what his citizenship was, and he responded, "Mexico." Tr. at 47. When asked if he had any immigration documents with him, Guillen-Zapata answered that he did not. Agent Duggan smelled marijuana coming from the truck cab and saw wrapped packages behind the front seat, which looked to him like packages of marijuana. When asked what he was carrying, Guillen-Zapata responded, "Nothing." Tr. at 48. Then he changed his answer to say he did not know. Tr. at 48. Agent Duggan opened one of the side compartments of the truck and, upon observing more bundles, he radioed ahead to tell other agents to stop the lead truck. The agents discovered 1,650 pounds of marijuana in

Guillen-Zapata's truck and subsequently discovered 1,600 pounds of marijuana in the lead truck.

The lead truck, which was driven by Erasmo Ruiz-Soto, was pursued by Border Patrol Agent David Joseph Blea. Ruiz-Soto at first slowed down and tried to waive the officer past him. When Agent Blea attempted to pull him over, he sped up and abruptly turned off-road, crashing through a fence and heading south toward the Mexican border, which was less than a mile away. When his truck became stuck, he attempted to flee on foot but was apprehended.

Co-defendant Ruiz-Soto filed a motion to suppress physical evidence and statements relating to his arrest, and Defendant-Appellant Guillen-Zapata later joined that motion. When it was denied, Guillen-Zapata pled guilty but then appealed the denial of suppression. He argues that the Border Patrol agents lacked reasonable suspicion to stop his vehicle and therefore violated his Fourth Amendment rights.

## II. Analysis

The Fourth Amendment requires a finding of reasonable suspicion that criminal activity may be afoot before conducting roving Border Patrol stops. *United States v. Gandara-Salinas*, 327 F.3d 1127, 1129 (10th Cir. 2003) (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "Although an officer's reliance on a mere hunch is insufficient to justify a stop, the likelihood of

criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.* (quoting *Arvizu*, 534 U.S. at 274). Under this standard, Border Patrol agents may stop vehicles "if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" of criminal activity. *Id.* (quoting *United States v. Monsisvais*, 907 F.2d 987, 989–90 (10th Cir. 1990) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975))). "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277.

The following factors are relevant in determining whether a law enforcement officer has reasonable suspicion to conduct an immigration stop: (1) characteristics of the area in which the vehicle is encountered; (2) proximity of the area to the border; (3) usual patterns of traffic on the particular road; (4) previous experience of the agent with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade officers; (7) aspects of the vehicle, such as a station wagon with concealed compartments; (8) the appearance that the vehicle was heavily loaded. *Gandara-Salinas*, 327 F.3d at 1129–30 (quoting *Monsisvais*, 907 F.2d at 990 (citing factors listed in *Brignoni-Ponce*, 422 U.S. at 884–85)).

In evaluating these factors, courts may not employ a "divide-and-conquer" approach by evaluating and rejecting each factor in isolation. *Arvizu*, 534 U.S. at 277. Instead, the ultimate determination of reasonable suspicion depends upon the totality of the circumstances. *Gandara-Salinas*, 327 F.3d at 1130. When making their determination, law enforcement officers may rely on their own experience and specialized training, and courts must defer to their ability to make inferences from and deductions about the cumulative information that may elude an untrained person. *See Arvizu*, 534 U.S. at 273; *United States v. De La Cruz-Tapia*, 162 F.3d at 1277–78.

The ultimate determination of reasonableness under the Fourth Amendment is a conclusion of law that we review de novo. *See De La Cruz-Tapia*, 162 F.3d at 1277. The evidence to support that conclusion, however, must be viewed in the light most favorable to the prevailing party, and we must accept the district court's findings of fact unless they are clearly erroneous. *Id.* at 1277–78.

On the facts above, the district court found that the Border Patrol possessed reasonable suspicion to stop Guillen-Zapata's vehicle. We are convinced that the totality of the circumstances supports the district court's ruling. Conceding only one factor, Guillen-Zapata attacks the court's findings on each of the other seven factors. As explained below, we find his arguments unpersuasive.

(1) As to the first factor (characteristics of the area in which the vehicle is encountered), Guillen-Zapata takes issue with the court's description of the area. The court described the Birchfield area as a remote and desolate desert. Guillen-Zapata argues that this was insufficient to support a conclusion that this factor weighed against him. However, it clearly must be analyzed in context with the remainder of the court's discussion and analysis. Specifically, the judge found that (I) the area was very near the Mexican border; (ii) no designated ports of entry were nearby; (iii) it had a history of illegal entries and drug seizures; (iv) after the sensor was triggered, Border Patrol observed only two vehicles within the relevant vicinity—those driven by Guillen-Zapata and Ruiz-Soto. These findings together demonstrate that the area lent itself to illegal border crossings and that, at least on the night in question, it produced a very narrow pool of suspects. We are satisfied this factor weighs in the government's favor.

(2) Guillen-Zapata concedes that the second factor (proximity to the border) weighs against him.

(3) As to the third factor (usual patterns of traffic on the particular road), Guillen-Zapata claims that the evidence in the record showed only specific flow and patterns of traffic during the time period at issue, as opposed to the general tendencies of traffic in the area. Agent Jimenez testified that he was monitoring Highway 9 on the evening in question and that only two vehicles (those driven by

Guillen-Zapata and Ruiz-Soto) passed within proximity to the sensor at the time it was activated. He also testified that ranchers in the area sometimes used the dirt road leading onto Highway 9 but that use of the road would not trigger the sensor. This testimony weighs against Guillen-Zapata, and no reason exists to believe generalized evidence would have been more helpful than specific evidence. Thus, absent any argument that the factor should have pointed in the opposite direction, we see no reason to reach a different conclusion than the district court reached on this factor.

(4)–(5) The fourth factor (previous experience of the agent with alien traffic) and fifth factor (information about recent illegal border crossings in the area), similarly weigh against Guillen-Zapata. The agents testified to their involvement with several operations in prior years and to familiarity with illegal drug runs across the border in the recent past. Guillen-Zapata argues that the agents should have compared prior arrests to the one at issue to show their specific knowledge of and experience with particular fact scenarios. However, their testimony of experience in the same field within the same geographic area is sufficient, so long as their testimony was credible. *Compare United States v. Gandara-Salinas*, 327 F.3d at 1131 (basing its conclusion on similarly generalized statements that the agent had experience in "narcotics seizures" and that the highway was a "common route for smuggling undocumented immigrants and

illegal drugs" across the Mexican border). We generally defer to the district court on credibility determinations, and the record does not suggest any basis for concluding its decision was clearly erroneous.

Guillen-Zapata also argues that the agents' experience was not extensive enough. Agent Duggan, who made the traffic stop, had been a Border Patrol agent in this sector for approximately five years and had helped conduct approximately six drug seizures within the Birchfield area alone. Three of those involved Highway 9. Agent Jimenez, who provided Agent Duggan with information based on his own observations at and near the sensor, had worked in this Border Patrol sector for approximately six and a half years and, during that time, had been involved in several drug seizures on Highway 9. As the United States Supreme Court has made clear, courts should be hesitant to second-guess law enforcement officers' ability to detect suspicious conduct when they possess experience and specialized training in that area. *See Arvizu*, 534 U.S. at 273; *see also De La Cruz-Tapia*, 162 F.3d at 1277–78. We disagree with the defendant's suggestion that an agent must be involved in hundreds or thousands of operations before we will defer to his expertise and agree with the district court that this record provides sufficient basis for this factor to weigh in favor of the government.

(6) As to the sixth factor (the driver's behavior, including attempts to evade officers), Guillen-Zapata correctly points out that, when discussing driver behavior, the court referred only to the truck driven by Ruiz-Soto in its explanation of this factor.[1]  However, the judge noted in his fact section that when Agent Duggan stopped Guillen-Zapata's vehicle, he knew that (i) there was a sensor activation; (ii) vehicle tracks indicated westbound traffic; (iii) Border Patrol agents were monitoring two utility trucks headed westbound on Highway 9; (iv) his law enforcement presence caused the two vehicles, which were traveling close together, to greatly increase the distance between them; and (v) Guillen-Zapata was wearing a hard hat although he clearly was not on a construction site. Agent Duggan's experience in the Border Patrol made him suspicious of the vehicles' sudden distancing, and his experience in the construction industry made him suspicious of someone who was wearing a hard hat when not at work.  Given the testimony presented, the district court's fact findings are not clearly erroneous.[2]

---

[1] On this point, it should be noted that the written order was drafted pursuant to the judge's oral statements, which were given in response to specific oral arguments made by Ruiz-Soto's attorney.

[2] The issue of probable cause to search the vehicle, based upon the scent of marijuana and view of wrapped packages in the cab, is separate from the issue of reasonable suspicion to stop the car in the first place. *See Brignoni-Ponce*, 422 U.S. at 881–82.  Only the latter is challenged in this appeal.

(7) The seventh factor (aspects of the vehicle, such as a station wagon with concealed compartments), is no help for Guillen-Zapata. He argues the court's finding that the trucks were "utility vehicles" was insufficient to support the factor relating to covered compartments, because the Border Patrol agents did not specifically say they were suspicious of the vehicles based on their potential to hold contraband. We need not state the obvious on every point; Guillen-Zapata's vehicle falls squarely within this category.

(8) Finally, as to the eighth factor (the appearance that the vehicle was heavily loaded), Guillen-Zapata does not put forth any argument to explain why it should weigh in either direction, given that these were utility vehicles that were built for heavy loads and thus unlikely to show the weight they were carrying. In addition, even if this factor were considered to weigh in favor of Guillen-Zapata, the overwhelming evidence presented by the remaining factors is sufficient to support reasonable suspicion.

### III. Conclusion

In light of the above-stated reasons, we agree with the district court that the totality of the circumstances supports a finding of reasonable suspicion by the Border Patrol and conclude that Guillen-Zapata's Fourth Amendment rights were not violated. We therefore AFFIRM the decision to deny Defendant-Appellant's motion to suppress statements and physical evidence.

Entered for the Court

Timothy M. Tymkovich
Circuit Judge