[Cite as *State v. Benefield*, 2025-Ohio-1116.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | : | JUDGES: |
| | : | Hon. Craig R. Baldwin, P.J. |
| Plaintiff - Appellee | : | Hon. William B. Hoffman, J. |
| | : | Hon. Andrew J. King, J. |
| -vs- | : | |
| | : | |
| UNDRAY BENEFIELD, | : | Case No. 2024CA00067 |
| | : | |
| Defendant - Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:          Appeal from the Stark County Court
                                                          of Common Pleas, Case No. 2023
                                                          CR 1603

JUDGMENT:                                     Affirmed

DATE OF JUDGMENT:                      March 28, 2025

APPEARANCES:

For Plaintiff-Appellee                            For Defendant-Appellant

KYLE L. STONE                                   DONOVAN R. HILL
Prosecuting Attorney                            122 Market Ave. North
Stark County, Ohio                               Dewalt Building, Ste. 101
                                                          Canton, Ohio 44702

By: CHRISTOPHER A. PIEKARSKI
Assistant Prosecuting Attorney
110 Central Plaza South, Ste. 510
Canton, Ohio 44702-1413

*Baldwin, P.J.*

{¶1}   The appellant, Undray Benefield, appeals from the trial court's decision denying his motion to suppress the results of a blood draw taken pursuant to a warrant following his involvement in a fatal automobile accident. Appellee is the State of Ohio.

## STATEMENT OF THE FACTS AND THE CASE

{¶2}   On June 20, 2023, at approximately 9:20 p.m., the appellant ran a red light at the intersection of East State Street and South Seneca Avenue, in Alliance, Ohio, causing a fatal, two-vehicle accident. When law enforcement officers arrived at the scene the appellant was attempting to leave on foot. The appellant was initially transported to Aultman Hospital in Alliance, where Sergeant Christopher McCord made contact with him shortly after the accident in order to conduct a follow-up interview for the crash investigation. The appellant refused to cooperate with hospital staff, and they had to physically restrain him and force medication into his IV in order for him to be docile enough to be intubated so he could be treated for his injuries.  Sergeant McCord smelled the odor of alcohol emitting from the appellant's person.

{¶3}   Based upon the appellant's odor of alcohol, Sergeant McCord sought and obtained a search warrant to draw a sample of the appellant's blood. He thereafter proceeded to Aultman Hospital in Canton, where the appellant had been transferred for further treatment, with "collection kits," which included blood vials. Sergeant McCord presented the warrant to hospital staff, who contacted their legal department, who then approved the blood draw. Sergeant McCord signed paperwork for the blood draw at 12:17

a.m., less than three hours after the crash was reported and within the statutorily required three-hour timeframe, and then personally witnessed the blood draw.

{¶4}   The results of the appellant's blood draw evidenced his level of intoxication at the time of the collision, which was in excess of that allowable by law. The matter was bound over from the Alliance Municipal Court, and on August 24, 2023, the Stark County Grand Jury indicted the appellant on the following charges:

- Count 1: aggravated vehicular homicide, in violation of R.C. 2903.06(A)(1)(a)/(B)(2)(b)(i), a felony of the first degree;

- Count 2: aggravated vehicular homicide, in violation of R.C. 2903.06(A)(1)(a)/(B)(2)(a), a felony of the second degree;

- Count 3: aggravated vehicular homicide, in violation of R.C. 2903.06(A)(2)(a)/(B)(3), a felony of the third degree;

- Count 4: operating a vehicle under the influence of alcohol, a drug of abuse or a combination of them ("OVI"), in violation of R.C. 4511.19(A)(1)(a)/(A)(1I)G)/(A)(1)()/(G)(1)(b), a misdemeanor of the first degree; and,

- Count 5: driving under suspension or in violation of license restriction, in violation of R.C. 4510.11(A)/(D)(1), a misdemeanor of the first degree.

The appellant was arraigned on September 1, 2023, at which time he pleaded not guilty to the charges set forth in the indictment.

{¶5}   On September 14, 2023, the appellant filed a motion to suppress the results of his blood test in which he set forth a general assertion that the appellee could not

demonstrate the blood sample was collected, handled, transported, or analyzed in compliance with R.C. 4511.19 and with the Ohio Department of Health rules regarding chemical tests. He did not provide any specific allegations of purportedly non-compliant handling of his blood samples in his motion. On October 2, 2023, he supplemented his motion with a motion to suppress his urine test.

{¶6} The trial court conducted a suppression hearing on October 12, 2023, at which the appellee presented the testimony of the following four witnesses: (1) Sergeant McCord of the Alliance Police Department; (2) Nurse M.R. of Aultman Hospital in Canton; (3) Criminalist L.P. of the Ohio State Highway Patrol ("OSHP") Crime Lab; and, (4) Criminalist L.M. of the OSHP Crime Lab.

{¶7} Nurse M.R. testified that she was working at Aultman Hospital in Canton that night, and both treated the appellant and encountered Sergeant McCord. She performed a blood draw on the appellant pursuant to the search warrant presented by Sergeant McCord using an already-established IV site on the appellant to avoid causing any additional, unnecessary trauma by poking him with another needle; drew a standard "waste" of 10 mL of blood; attached a Vacutainer (and the tubes provided by Sergeant McCord's kit); and, drew the appellant's blood. According to M.R., it was a standard blood draw and nothing abnormal occurred. She could not say whether any antiseptic was applied to the appellant's skin prior to drawing his blood because the IV was already placed prior to the appellant's arrival at the Canton location of Aultman Hospital.

{¶8} Once the blood tubes were filled, M.R. labeled them and handed them back to Sergeant McCord, who testified that he personally delivered the blood tubes to the

secure property room at the Alliance Police Department, where they were held temporarily in a secure refrigerator before being sent out for testing.

{¶9} Criminalist L.P. is an expert in the field of toxicology, and testified regarding the OSHP crime lab's procedures for the intake and management of blood samples. When a sealed sample arrives at the lab, evidence intake technicians date and timestamp when it is received, which starts the lab's chain of custody. The sample is thereafter logged into the Laboratory Information Management System ("LIMS") and placed in the evidence-receiving refrigerator. An analyst then retrieves the sample and performs testing on it. Once finished, the analyst places the sample in a "badge access" walk-in freezer for storage.

{¶10} The United States Postal Service ("USPS") delivered the appellant's blood samples to the crime lab. L.P. identified the two tubes that contained the appellant's blood, and further identified all of the information on their respective labels which included: (1) a unique identifier number (23-005351); (2) the subject's name (the appellant); (3) the collector's name (M.R.); (4) the date and time the sample was collected (June 21, 2023, at 12:17 a.m.); (5) L.P.'s initials; and, (6) the number 1 or 2, for each tube respectively. There was no evidence that the labels had been tampered with in any way.

{¶11} L.P. testified that she performed analytical testing on Tube 1 of the appellant's blood between July 7, 2023, and July 11, 2023, then interpreted the data and prepared a report. According to L.P., four days is a common and normal timeframe for such testing, which usually takes a week, depending on any "issues" that may arise. L.P. was tasked with testing the appellant's blood for alcohol content, so she performed a "headspace gas chromatography with flame ionization detection" test, a scientific process

that she explained to the trial court in great detail. She followed all the procedures and requirements for testing the blood sample, and testified that she was unaware of any "deviations." According to L.P., the testing was "pretty standard," and no problems or issues occurred. L.P. found that the sample of the appellant's blood contained 0.173 grams by weight of alcohol per 100 mL of whole blood.

{¶12} Criminalist L.M., an expert in the fields of toxicology and toxicological testing, also provided testimony. She testified regarding the chain of custody, which is generated when samples are delivered to the lab, and any "movement" of the sample is then tracked accordingly through the LIMS system. She testified that only the criminalists in toxicology are granted "badge access" to the lab refrigerator where the samples are stored, and they must use a dedicated PIN number known only to them to access the lab. All samples are stored for a period of two years from the date of receipt at the lab. The rules and procedures regarding the transport and the "checking in" and "checking out" of the samples in connection with the appellant's case were followed.

{¶13} L.M. testified that she tested the appellant's blood sample for the presence of controlled substances, and then generated a report. The sample she tested was received from the USPS on June 30, 2023, at 2:11 p.m., as a "sealed kit" with "two sealed blood tubes." L.M. observed nothing concerning about the blood samples themselves when she performed the tests. She tested the blood from July 24, 2023, through August 7, 2023, which she testified is a "normal" timeframe for this type of testing. She first performed a screening test, utilizing "liquid chromatography-tandem mass spectrometry" ("LC-MS"), which she described for the trial court in great detail. L.M. testified that she ran a couple of confirmations, then utilized "gas chromatography/mass spectrometry,"

specifically for THC testing. She initially used Tube 1 for the screening and two confirmations, then had to also use Tube 2 because more blood was required to test specifically for the presence of THC. L.M. found that the appellant's blood (specimen number 23-005351) contained all of the following:

- 11-nor-9-carboxy-tetrahydrocannabinol (otherwise known as THC metabolite) at a level of 111.32 nanograms per milliliter;

- Fentanyl at 81.12 nanograms per milliliter;

- Midazolam at 49.79 nanograms per milliliter; and, Lorazepam at 675.34 nanograms per milliliter.

{¶14} On November 1, 2023, after the suppression hearing, the appellant filed a second supplement to his motion to suppress containing much more specific arguments regarding the admissibility of the appellant's blood test results. The trial court filed a judgment entry on November 27, 2023, in which it, inter alia, denied the appellant's motion to suppress the results of the blood test.

{¶15} On April 1, 2024, the appellant withdrew his former pleas of not guilty and pleaded no contest to the charges as set forth in the indictment. The trial court accepted his pleas and found him guilty of all charges. The court merged Counts 2 and 3 into Count 1 for purposes of sentencing, sentenced the appellant on Count 1 to a minimum mandatory prison term of 7 years and a maximum mandatory prison term of 10 ½ years, and suspended his driver's license for his lifetime. The court sentenced the appellant to 180 days in jail on Count 4, suspended his driver's license for one year, assessed six points on his license, and fined him $375.00. Finally, the court sentenced the appellant to

180 days in jail on Count 5. The court ordered the sentences to be served concurrently with one another. On April 15, 2024, the court filed a corresponding Judgment Entry.

{¶16} The appellant filed a timely appeal in which he sets forth the following sole assignment of error:

{¶17} "I. THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO SUPPRESS THE RESULTS OF HIS BLOOD DRAW WHEN THE STATE FAILED TO DEMONSTRATE THE DRAW WAS IN SUBSTANTIAL COMPLIANCE WITH THE REGULATIONS SET FORTH IN OHIO ADMINISTRATIVE CODE SECTION 3701-5305."

## STANDARD OF REVIEW

{¶18} Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside,* 2003-Ohio-5372, ¶ 8. When ruling on a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and to evaluate witness credibility. See, *State v. Dunlap,* 73 Ohio St.3d 308, 314 (1995); and, *State v. Fanning,* 1 Ohio St.3d 19, 20 (1982). Accordingly, a reviewing court must defer to the trial court's factual findings if competent, credible evidence exists to support those findings. See *Burnside,* supra; *Dunlap,* supra; *State v. Long,* 127 Ohio App.3d 328, 332 (4th Dist.1998); and, *State v. Medcalf,* 111 Ohio App.3d 142 (4th Dist.1996). However, once this Court has accepted those facts as true, it must independently determine as a matter of law whether the trial court met the applicable legal standard. See *Burnside,* supra, citing *State v. McNamara,* 124 Ohio App.3d 706, 707 (4th Dist.1997); See, generally, *United States v. Arvizu,* 534 U.S. 266 (2002); and, *Ornelas v. United States,* 517 U.S. 690 (1996). That is, the application of the law to the trial court's findings of fact is subject to a *de novo* standard of review *Ornelas, supra.* Moreover, due

weight should be given "to inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas,* supra at 698.

**ANALYSIS**

**{¶19}** R.C. 4511.19 provides, inter alia, for blood draws in connection with individuals who are alleged to have been driving while under the influence of alcohol or drugs, and states in pertinent part:

> In any criminal prosecution or juvenile court proceeding for a violation of division (A) or (B) of this section or for an equivalent offense that is vehicle-related, the court may admit evidence on the concentration of alcohol, drugs of abuse, controlled substances, metabolites of a controlled substance, or a combination of them in the defendant's whole blood, blood serum or plasma, breath, urine, or other bodily substance at the time of the alleged violation as shown by chemical analysis of the substance withdrawn within three hours of the time of the alleged violation. The three-hour time limit specified in this division regarding the admission of evidence does not extend or affect the two-hour time limit specified in division (A) of section 4511.192 of the Revised Code as the maximum period of time during which a person may consent to a chemical test or tests as described in that section. The court may admit evidence on the concentration of alcohol, drugs of abuse, or a combination of them as described in this division when a person submits to a blood, breath, urine, or other bodily substance test at the request of a law enforcement officer under section 4511.191 of the Revised Code or a blood or urine sample is obtained pursuant to a search

warrant. Only a physician, a registered nurse, an emergency medical technician-intermediate, an emergency medical technician-paramedic, or a qualified technician, chemist, or phlebotomist shall withdraw a blood sample for the purpose of determining the alcohol, drug, controlled substance, metabolite of a controlled substance, or combination content of the whole blood, blood serum, or blood plasma. This limitation does not apply to the taking of breath or urine specimens. A person authorized to withdraw blood under this division may refuse to withdraw blood under this division, if in that person's opinion, the physical welfare of the person would be endangered by the withdrawing of blood.

The bodily substance withdrawn under division (D)(1)(b) of this section shall be analyzed in accordance with methods approved by the director of health by an individual possessing a valid permit issued by the director pursuant to section 3701.143 of the Revised Code.

R.C. 4511.19 (D)(1)(b). The Ohio Supreme Court has spoken on this Revised Code section, stating:

The legislature in Ohio has directed that in a criminal prosecution for a violation of R.C. 4511.19(A) or (B), a bodily substance shall be analyzed in accordance with methods approved by the director of health, R.C. 4511.19(D)(1)(b), and that the director of health "shall determine, or cause to be determined, techniques or methods for chemically analyzing a person's whole blood," R.C. 3701.143. Pursuant to these directives, the director of health promulgated Ohio Adm. Code 3701–53–05.

*State v. Baker*, 2016-Ohio-451, ¶ 16.

**{¶20}** Ohio Administrative Code 3701–53–06 (formerly 3701-53-05) sets forth the standards for collection a legal blood sample, and states in pertinent part:

(A)     All samples are to be collected in accordance with section 4511.19 or section 1547.11 of the Revised Code, as applicable.

(B)     When collecting a blood sample, an aqueous solution of a non-volatile antiseptic will be used on the skin. No alcohols will be used as a skin antiseptic.

(C)     Blood is to be drawn with a sterile dry needle into a vacuum container with an anticoagulant according to the laboratory protocol as written in the laboratory procedure manual based on the type of specimen being tested. Anticoagulant coated vacuum tubes include standard purple, blue, green, pink, tan, gray, yellow and white topped tubes.

\*          \*          \*

(E)     The collection of an oral fluid specimen is to be done according to the sample collection device instructions.

(F)     Blood, urine, and oral fluid containers are to be sealed in a manner such that tampering can be detected and have a label which contains at least the following information:

(1)     Name of subject;

(2)     Date and time of collection;

(3)     Name or initials of person collecting the sample; and

(4)     Name or initials of person sealing the sample.

(G)     While not in transit or under examination, all blood, urine and oral fluid specimens will be refrigerated.

**{¶21}** The issue of compliance with these requirements was discussed by this Court in *State v. Bordeau,* 2023-Ohio-2040 (5th Dist.):

The Ohio Supreme Court has held rigid compliance with ODH regulations is not required, as such compliance is not always humanly or realistically possible. *State v. Plummer*, 22 Ohio St.3d 292, 294, 490 N.E.2d 902 (1986). Rather, if the State shows substantial compliance with the regulations, absent prejudice to the defendant, alcohol and drug tests results are admissible. *Id.*

However, the burden to establish substantial compliance only extends to the level with which the defendant takes issue with the legality of the test. *State v. Johnson*, 137 Ohio App.3d 847, 851, 739 N.E.2d 1249 (2000); *State v. Crothers*, 12th Dist. Clinton No. CA2003-08-020, 2004-Ohio-2299, 2004 WL 1040697, ¶ 10. When the defendant's motion to suppress merely raises a generalized claim of inadmissibility and identifies the section(s) of the Administrative Code implicated in the claim, the burden on the State is slight. *State v. Bissaillon*, 2nd Dist. Greene No. 06-CA-130, 2007-Ohio 2349, 2007 WL 1429626, ¶ 12; *State v. Williams*, Montgomery App. No. 16554, unreported, 1998 WL 214595 (Apr. 24, 1998); *State v. Embry,* 12th Dist. Warren No. CA2003-11-110, 2004-Ohio-6324, 2004 WL 2698417, ¶ 24 (simply reiterating Administrative Code provisions creates a burden on the State to respond only in general to the issues raised). The

State is only required to present general testimony there was substantial compliance with the requirements of the regulations; specific evidence is not required unless the defendant raises a specific issue in the motion to suppress. *Id.*; *Bissaillon*, *supra*, 2007-Ohio-2349 at ¶ 12; *State v. Crotty*, 12th Dist. Warren No. CA2004-05-051, 2005-Ohio 2923, 2005 WL 1385223, at ¶ 19.

{¶22} In the case sub judice, the appellant's September 14, 2023, Motion to Suppress set forth only a generalized argument, devoid of specificity, regarding the appellee's purported non-compliance regarding the collection of his blood samples. His motion argued that the appellee could not "prove that the [blood] sample was obtained in compliance with R.C. 4511.19(D) or that involved parties collected, handled, transported, or analyzed the same in compliance with the ODH rules regarding chemical tests as prescribed by the OAC." The appellee addressed these arguments at the October 12, 2023, suppression hearing through the presentation of testimony from Sergeant McCord of the Alliance Police Department; Nurse M.R. of Aultman Hospital in Canton; Criminalist L.P. of the Ohio State Highway Patrol ("OSHP") Crime Lab; and, Criminalist L.M. of the OSHP Crime Lab. It was only during closing arguments, and after the close of evidence, that the appellant proffered more specific arguments, and then filed a second supplement to his motion to suppress setting forth more specific arguments against the admissibility of the blood sample results.

{¶23} As set forth in *Bordeau,* when a defendant's motion to suppress makes merely general assertions of non-compliance with the applicable statute and regulations, the prosecution is only required to present general testimony that there was substantial

compliance with the requirements of the regulations; specific evidence is not required unless the defendant raises a specific issue in his motion to suppress. When a defendant seeks the benefit of a highly specific regulation, he must make a specific argument in his motion; he is not entitled to a "second bite at the apple" after the prosecution has concluded its arguments and rested its case at the motion to suppress hearing.

{¶24} In this case, the appellant failed to raise specific issues in his September 14, 2023, Motion to Suppress, proffering specific arguments only after the close of evidence - during closing arguments at the conclusion of the suppression hearing, and in a second supplemental motion filed after the hearing. The appellant is required to be specific in his arguments regarding any alleged failure on the part of the State to comply with the applicable statute and regulations. Because the appellant failed to do so, the appellee was required only to show substantial compliance with the applicable statute and regulations, which it did via the testimony of Sergeant McCord, Nurse M.R., and Criminalists L.P. and L.M. Furthermore, no evidence has been presented that the appellant suffered prejudice as a result of the manner in which the blood was drawn in this case.

{¶25} The burden to establish substantial compliance with the applicable statute and regulations extends only to the level with which the appellant took issue with the legality of the blood draw. The appellant's motion to suppress merely raised a generalized claim of inadmissibility and identified sections of the Ohio Administrative Code purportedly implicated; it did not set forth a factual basis for any of the claimed violations. Thus, the appellee's burden was slight. The evidence presented by the appellee established that it substantially complied with the requirements set forth in R.C. 4511.19(D)(1)(b) and Ohio

Administrative Code 3701–53–06. Furthermore, rigid compliance with the applicable regulations is not required, as such compliance is not always humanly or realistically possible, particularly in this case, where the appellant was uncooperative upon arrival at the hospital and had to be physically restrained in order to be docile enough to receive treatment for his injuries. The trial court did not err in denying the appellant's motion to suppress the results of his blood draw.

## CONCLUSION

{¶26} Based upon the foregoing, we find the appellant's assignment of error to be without merit, and it is therefore overruled. The judgment of the Stark County Court of Common Pleas is hereby affirmed.

By: Baldwin, P.J.

King, J. concur

Hoffman, J. dissents.

*Hoffman, J., dissenting*

{¶27}  I respectfully dissent form the majority opinion.

{¶28}  Crim.R. 47 requires all written motions to state with particularity the grounds upon which they are made.  The question presented herein becomes how much particularity is available and how much is needed to put the State on notice of the underlying basis for the motion to suppress.

{¶29}  It would seem there are two generalized ways to support a motion to suppress.  The first would be a factual attack.  Those facts would usually be based on the defendant's personal knowledge or other facts readily available to the defendant, e.g. police reports and video cam data.

{¶30}  For example, a defendant's personal knowledge of the events surrounding a contested traffic stop can be challenged with specificity.  Likewise, a defendant's claim contesting an alleged consent to search lies within the defendant's personal knowledge and is fully capable of being asserted with particularity.

{¶31}  The second generalized way to support a motion to suppress is an attack based on the law.  For example, a challenge to the sufficiency of the affidavit used to establish probable cause for the issuance of a search warrant, such as whether the length of detention of a stopped motorist to conduct a dog sniff is reasonable, or the lack of Miranda warnings during a custodial interrogation, are specific legal challenges which can be articulated with specificity.

{¶32}  I suggest the present case presents somewhat of a hybrid of those two generalized ways to support a motion to suppress.  Appellant's legal basis for suppression

based on non-compliance with ODH regulations is necessarily premised upon factual information unknown to him prior to the hearing.

{¶33} The Civil Rules provide a litigant discovery tools not available to a criminal defendant. As demonstrated here, the defendant had no way of knowing the facts necessary to particularize how the State might have failed to comply with the administrative rules governing a blood test. Only testimony presented at a suppression hearing, whether revealed on direct examination or discovered through cross-examination, would give the defendant sufficient factual details to allow the defendant to assert a more "particularized" ground(s) to challenge the results of his blood test. While I concede the defendant's assertion "… the State cannot prove the [blood] sample was obtained in compliance with R.C. 4511.19(D)" is generalized, but given the unavailability of the particular facts related to the blood draw at the time of filing his Motion to Suppress, I find Appellant "substantially complied" [to borrow the phrase] with the requirement of Crim.R. 47.

{¶34} Significantly, the State apparently was on sufficient notice of the grounds of the motion, as it solicited evidence on direct examination of its own witnesses' testimony addressing the requirements for blood tests set forth in the O.A.C.

{¶35} Regardless of whether the State was required to present only general testimony of substantial compliance or the higher burden of strict compliance, I find the State failed to do so. As noted by the majority, the Ohio Supreme Court has held rigid compliance with ODH regulations is not required, as such compliance is not always humanly or realistically possible. Such is not the case here.

**{¶36}** The requirement I find unsatisfied is OAC 3701-53-06(B): "When collecting a blood sample, an aqueous solution of a non-volatile antiseptic will be used on the skin. No alcohol will be used as a skin antiseptic."

**{¶37}** The majority notes Nurse M.R. could not say whether any antiseptic was applied to [A]ppellant's skin prior to drawing his blood because the IV [from which she drew Appellant's blood] was already placed prior to the [A]ppellant's arrival at Aultman Hospital. Obviously, Nurse R.A. had no way of knowing that at the time. This is not the same situation relied upon by the State that even if a nurse does not specifically testify about applying an aqueous solution of a non-violative, non-alcoholic antiseptic, her testimony she used at "sealed kit" for OVI blood draws reasonably supported an inference of compliance. See Appellee's brief at pg. 16. Nurse M.R.'s testimony in this matter explicitly contradicts such inference.

**{¶38}** Let me hasten to add, at this juncture, I place no fault nor blame on Nurse M.R. Her motives for using the already inserted IV were both reasonable and humanitarian. In hindsight, Officer McCord could have explained the significance of compliance with the ODH blood draw instructions and insisted the blood not be drawn using the IV site. Nonetheless, strict compliance with the ODH regulation was neither humanly nor realistically impossible.

**{¶39}** I conclude the evidence presented showed the ODH regulation, noted above, was neither strictly nor substantially complied with. I would sustain Appellant's assignment of error.